FILED
Clerk
District Court

AUG 3 1 2006

For The Northern Mariana Islands
By__________
(Deputy Clerk)

**JOE HILL**
Hill Law Offices
Susupe Village
P.O. Box 500917
Saipan, MP 96950

Tel: (670) 234-6806/7743
Fax: (670) 234-7753

Attorney for Plaintiffs,

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN MARIANA ISLANDS**

**ABELLANOSA, JOANNA, et al.,**

**Plaintiffs,**

**v.**

**L&T INTERNATIONAL CORPORATION,**

**Defendant.**

**Civil Action No. 05-0010**

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT**

**Date: September 14, 2006**
**Time: 9:00 a.m.**
**Judge: Hon. Alex R. Munson**

Plaintiffs, by counsel, hereby oppose Defendant L&T's Motion for Summary Judgment and cross move for Summary Judgment on all causes of Actions as follows:

## I. STANDARD OF REVIEW

**A. Summary Judgment - Generally**. Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM.MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

"In ruling on a motion for summary judgment, the 'evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor.'" Orsini v. O/S Seabrooke O.N., 247 F.3d 953, 958 (9th Cir. 2001) (*quoting* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, [2513], 91 L.Ed.2d 202 (1986)). Movant bears the initial burden of demonstrating the absence of a genuine question of material fact for trial. Devereaux v. Abbey, __ F.3d. __, Slip Op. p. 5, 2001 WL 1008128 (9th Cir., Sept. 5, 2001) (*en banc*). The underlying substantive law governing the claims determines whether or not it is material. Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000); Price v. Taco Bell Corporation, 934 F.Supp. 1193, 1196 (D.Or.1996). Reasonable doubts as to the existence of material factual issues are resolved against the movant. *Addisu*, 198 F.3d at 1134. Where defendant is the moving party and he bears the burden of proof at trial on an affirmative defense, he must come forward with admissible evidence as to each element essential to establish the affirmative defense. Marchant v. U.S. Collections West, Inc., 12 F.Supp.2d 1001, 1004 (D.Ariz.,1998); Fox v. Citicorp Credit Services, Inc., 15 F.3d 1507, 1514 (9th Cir. 1994); Gifford v. Atchison, Topeka and Santa Fe Ry. Co., 685 F.2d 1149, 1155 (9th Cir. 1982).

Where the movant does not bear the burden of proof at trial, he must make an initial showing that "there is an absence of evidence to support the nonmoving party's case." *Celotex*, *supra*, 477 U.S. at 325, 106 S.Ct. at 2554. *Accord*, *Devereaux*, *supra*, Slip Op. at 5; Block v. City of Los Angeles, 253 F.3d 410, 416 (9th Cir. 2001); Schwarz v. U.S., 234 F.3d 428, 436 (9th Cir. 2000).

The Ninth Circuit has characterized this initial showing as the movant's duty to set forth a "*prima facie* case for summary judgment." F.T.C. v. Gill, __ F.3d __, Slip Op., p.8,

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

2001 WL 1044631 (9th Cir., Sept. 12, 2001) (attached in Appendix of Supplemental Authorities). It has also characterized this as the initial burden of "production." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000). Only after movant satisfies his burden of production and makes out this *prima facie* case, does the burden shift to the nonmoving party to come forward with evidence showing there is a genuine issue for trial. *Ibid.*, *accord Gill*, *supra*, *Schwarz*, 234 F.3d at 436; *Devereaux*, Slip Op. at p. 5.

Within the confines of the Rule 56 motion, the movant without the burden of proof bears the ultimate burden of persuasion that it has made out a *prima facie* case entitling it to summary judgment. *Nissan Fire*, *supra*, 210 F.3d at 1102. If movant fails to make out this *prima facie* case, the non-moving party has no obligation to prove anything, even if he still has the ultimate burden of persuasion at trial. *Id.,* 210 F.3d at 1102-1103. In such a case, the nonmoving party defeats the motion for summary judgment without producing anything. *Id.,* 210 F.3d at 1103.

In Defendant's motion they treat plaintiffs' First, Third, Fourth and Seventh Causes of Action jointly as claims for breach of contract.

Defendant L&T moves for summary judgment on Plaintiffs First Cause of Action "because many of the plaintiffs admitted that they did not pay for their health clearance or physical examinations and because L&T was not obligated to pay these fees." (Defendant's Memorandum, page 2).

Defendant asserts that "the plaintiffs' contracts were terminated pursuant to the terms and conditions of the employment contracts."

That the employment contract provides for termination in the event of a "reduction in force due to adverse economic conditions or economic necessity."

Defendant asserts that "First, the Plaintiffs are not parties to the Non-resident Worker

Agreement and lack standing to enforce it." Defendant's Memorandum Page 5. (Id. p. 5)

**I.**

**HEALTH EXAMINATION & CERTIFICATE COSTS**

**ARE EMPLOYER EXPENSES**

L&T required each plaintiff listed in Exhibit "6" of the First Amended Complaint (FAC) to provide and use the health certificate then owned by each such Plaintiff for use by L&T in lieu of L&T itself paying for said certificate fee(s) and/or services that L&T as the employer was obligated to pay pursuant to statute, the rules and regulations of DOL and the Department of Health and Social Services (DHSS), and under the Employer's Nonresident Worker Agreement. The Employer's Agreement in pertinent parts, provides:

SECTION B-AGREEMENT

....

1. For and in consideration of being allowed to employ nonresident worker(s), the employer agrees to the terms and conditions herein set forth by the Director as follows:

A. To strictly adhere to the provisions of the Nonresident Worker's Act and amendments thereto, Wage and Hour Act and all other applicable Commonwealth laws, rules, regulations, the employment contract(s) and this agreement; and to procure copies of these laws.

....

E. Responsible for the repatriation and medical expenses, as well as all other expenses required by law of any nonresident worker to be employed or employed under this Agreement until the worker leaves the Commonwealth or is transferred to another employer.

F. That a minimum of forty (40) hours of work per week will be readily available at all times for the duration of the employment contract for any nonresident worker covered under this Agreement except when a work week is interrupted by recognized Commonwealth holidays, natural disasters, inclement which the Chief, in his sole discretion, determines that the Employer's inability to provide forty (40) hours of work was beyond the control of the Employers or an exception is granted. (Emphasis added).

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

3 CMC §4437(c) (Restrictions and Obligations), provides in pertinent parts:

"All nonresident employment contracts under this chapter shall provide that the employer is responsible and liable for the insurance or payment of all medical expenses of the nonresident worker, including cost of referral and evacuation for medical treatment outside the Commonwealth, and cost of the embalming and transportation of the body back to the country of origin in the event of death of the nonresident worker." (Emphasis added).

Alien Labor Rules and Regulations, Section II. B. 3. provides in pertinent parts:

"Submission, Review of Other Required Documents. Upon approval of an Employer's Application and Nonresident Employment Agreement, the employer shall submit a Nonresident Worker Application, which must include the following:

a. Employment Contract.

....

f. If the application is to fill a position within the garment industry, the employer must submit all additional documentation required by the Prescreen checklist - New Labor Permits-Garment, which may include a map to the location, bank certification, copy of the lease agreement, etc.

g. A sworn affidavit by the prospective employer that all of the obligations of the prospective employer and employee related to the application are included in the Employment Contract; including, but not limited to , the application fee, transportation costs, recruitment costs or other costs associated with the nonresident worker's employment; as well as an indication of which party agrees to undertake what obligations. This sworn affidavit does not change a prospective employer's obligation to pay the application fee and repatriation costs. Emphasis added.

3CMC Section 4438(b) in pertinent parts provides:

"The cost of any examination of a nonresident worker shall be borne by the employer. The cost of any examination of a member of the family of any nonresident worker shall be borne by either the worker or the employer, as the employment contract shall provide. The chief shall by regulation provide for annual physical examination of nonresident workers ... by any medical physician licensed ... in the Commonwealth ... when employment under this chapter will continue for more than one year. The cost of all examinations under this section shall reflect the total cost, including physician fees, of providing the examinations." Emphasis added.

Defendant-movant contends that "... there is no contractual obligation for L&T to pay

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

for an applicant's health clearance or medical examination. The contract of employment does not provide for the payment of these costs." (Memorandum, page 6).

However L&T on page 1, paragraph 4, Food, Lodging and Others, of the Employment Contract (Exhibit "A" Memorandum) acknowledges not only its obligation as employer to pay such costs, but prospectively seeks to apportion such costs between employer and employee as follows:

> "4. Medical insurance or payment of all medical expenses of the employee during the employee's legal stay in the Commonwealth ... will be paid by the employer unless applicable law provides otherwise or except as modified by case law. Any changes in CNMI laws that allow employer to have employees bear medical cost, the employees shall pay whatever costs are incurred in excess of what the company subsidizes. "

Thus, L&T's proffered defense and factual assertion that (1) it has no contractual obligation to pay for the medical physical examination and the health certificate fees of plaintiffs, and (2) that the contract of employment does not provide for the payment of these costs, appears to be without legal or factual foundation or authority, frivolous and hence, itself asserted in bad faith.

The legislative intent could hardly be plainer. "The cost of any examination of a nonresident worker shall be borne by the employer." 3 CMC Section 4438(b). And "(a)ll nonresident employment contracts under this chapter shall provide that the employer is responsible and liable for the insurance or payment of all medical expenses of the nonresident worker, including cost of referral and evacuation for medical treatment ...." Section 4437(c).

Alternatively as to L&T's motion to dismiss there remain material and substantive issues of material facts precluding summary judgment regarding the interpretation and application of the stated provisions and terms of the contract relative to covered medical cost and expenses to the extent that these contractual issues are factual, they are, as indicated, for

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

the trier of fact. To the extent that remaining issues raise questions of law, they are for the court, and summary judgment should be entered in favor of Plaintiffs and against Defendant on the First, Third, Fourth and Seventh Causes.

Alternatively, there remain questions of fact as to(1) whether promises or representations were made to Plaintiffs by employees of L&T, concerning the use of and payment for the subject health examination and health certificate fees and (2) whether there was a promise or representation made that led plaintiffs to believe that their employment was secure for the full year term of the contract and that they would be renewed the second year, unless terminated for good cause. See Affidavit of Tobias, In Support of Plaintiffs' Opposition.

The Regulations Governing the Health Screening Requirements of Alien Employees, Commonwealth Register, Volume 19 Number 02, February 15, 1997, Page 15167 et seq. provides in pertinent parts:

> 1. Purpose and Findings
> The purpose of these Rules and Regulations is to establish procedures and protocols for the issuance of Health Certificates to all Alien Employees.
>
> ....
>
> These new requirements are intended not only to maintain the health of all "Alien Employees who enter and reside in the CNMI to provide employee services to Employers pursuant to the provisions of the Nonresident Worker Act, 3 CMC §4411 et. Seq., but also to ensure the health of CNMI residents by preventing the spread of certain infectious and communicable diseases. It is the intent of the Division of Public Health to provide minimum requirements for the protection of life, health, safety, and welfare of CNMI residents by instituting these Rules and Regulations.
>
> ....
>
> The health screening of the Alien Employees will not only be beneficial to these workers and the residents of the CNMI, but will also be advantageous to employers. By overseeing compliance with the health screening of Alien Employees required by these Rules and Regulations, the employer can minimize the high costs of medical treatment here in the CNMI, and avoid the added cost of deportation in the event the Alien Employee is later found to have a communicable disease. Also relevant to Employers is that Alien Employees afflicted with communicable diseases

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

are less productive. By ensuring that Alien employees obtain the required health screening, Employees can assure the relative health of the Alien Employees they employ.

....

2.11. Health Certificate means an authorization issued by the Secretary to an Alien Employee certifying that the Alien employee has been examined and found to be in good health, and free of specified communicable diseases.

....

2.15 Physical examination means a medical examination performed by a Physician.

....

3.3. Cost of Physical Examination. The cost of the Alien Employee's Physical Examination shall be the financial responsibility of the Alien Employee's Employer.

....

5.3. Cost of Health Certificates. The cost of an Alien Employee Health Certificate shall be Twenty dollars ($20.00), payable to the Department upon issuance of the health Certificate. The Employer of the Alien Employee shall be responsible for the cost of the Health Certificate.

Thus the costs for the medical physical examinations and health certificates are by law determined to be the obligation of the employer of an alien-contract worker and as such are employer expenses based on public policy. Restatement 2d, Contracts, Section 207, Interpretation Favoring the Public, *See* Comment a.

Hence, but for Plaintiffs in Exhibit "6" tendering and giving L&T their unexpired health certificates, L&T as the employer would have been obligated to pay the certificate .

L&T by demanding that the Plaintiffs-employees cover these obligations by providing and using health certificates owned by the workers, or paying for new health certificates, seek to shift its obligation to bear the costs of the physical examination and health certificate fees.

**II**

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

**SHIFTING OF EMPLOYER EXPENSES AFFECTS WAGES**

3 CMC Section 4437(b) provides in pertinent parts:

"(b) no nonresident worker employed pursuant to this chapter shall be paid less than any minimum wage applicable ... and provided by law."

The First and Second Causes of Action both revolve around determination of whether subject health examination fees and health certification fees are employer expenses, hence they may be analyzed in tandem.

In Arriaya v. Florida Pacific Farms, L.L.C., 305 F.3d 1228,___, (11th Cir. 09/11/2002) the court in addressing employer expenses determined and reasoned, thusly:

> "The Growers contend that the FLSA was satisfied because the Farmworkers' hourly wage rate was higher than the FLSA minimum wage rate and deductions were not made for the costs the Farmworkers seek to recover. The district court correctly stated that there is no legal difference between deducting a cost directly from the worker's wages and shifting a cost, which they could not deduct, for the employee to bear. An employer may not deduct from employee wages the cost of facilities which primarily benefit the employer if such deductions drive wages below the minimum wage. See 29 C.F.R. §531.36(b). This rule cannot be avoided by simply requiring employees to make such purchases on their own, either in advance of or during the employment. See id. §531.35; Ayres v. 127 Rest. Corp., 12 F. Supp.2d 305, 310 (S.D.N.Y. 1998). *Fn9
>
> If an expense is determined to be primarily for the benefit of the employer, the employer must reimburse the employee during the workweek in which the expense arose. See 29 C.F.R. §531.35. *fn10 Situations in which items such as required tools or uniforms were purchased before the first workweek are not explicitly covered by the regulations. However, there is simply no legal difference between an employer requiring a worker to have the tools before the first day of work, requiring the tools to be purchased during the first workweek, or deducting the cost of the tools from the first week's wages. Compliance with the FLSA is measured by the workweek. See id. §776.4. Workers must be reimbursed during the first workweek for pre-employment expenses which primarily benefit the employer, to the point that wages are at least equivalent to the minimum wage. *fn11 Cf. Marshall v. Root's Rest., 667 F.2d 559,560 (6th Cir.1982) (affirming district court finding that defendants required waitresses to wear uniforms at work and that the cost of uniforms therefore pushed first week pay below minimum wage).

In Arriaga v. Florida, the court in discussing the application of

C.F.R. Section 531.32(c) observed that "Subsection (c) also lists items.

"Which have been held to be primarily for the benefit or convenience of the employer and are not therefore to be considered 'facilities' within the meaning of section 3(m)"; Safety caps, explosives, and miners' lamps (in the mining industry); electric power(used for commercial production in the interest of the employer; company police and guard protection; taxes and insurance on the employer's buildings which are not used for lodgings furnished to the employee; "dues" to chambers of commerce and other organizations used, for example, to repay subsidies given to the employer to locate his factory in a particular community; transportation charges where such transportation is an incident of and necessary to the employment (as in the case of maintenance-of-way employees of a railroad); charges for rental of uniforms where the nature of the business requires the employee to wear a uniform; medical services and hospitalization which the employer is bound to furnish under (various laws). Id. §531.32(c). 29 C.F.R. §531.3 also discuss items that are primarily for the benefit of the employer; the following is a list of facilities found by the Administrator to be primarily for the benefit of (sic) convenience of the employer: The list is intended to be illustrative rather than exclusive: (i) Tools of the trade and other materials and services incidental to carrying on the employer's business; (ii) the cost of any construction by and for the employer: *(iii)* the cost of uniforms and of their laundering, where the nature of the business requires the employee to wear a uniform. Id. §531.3(d)(2).

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

**III**

**UNLAWFUL TERMINATION**

L & T contends that under the employment Contract, it has an unconditional right to unilaterally terminate its nonresident worker contracts with Plaintiffs.

To the contrary Defendant's right to hire and use alien labor arises from and is restricted to and conditional labor arises from and is restricted to and conditioned on the terms and procedural requirements of the NWA.

Under the NWA the Defendant, as a condition precedent to being allowed to hire/employ Plaintiffs - aliens, specifically agreed under its Employer's Non-resident Worker Agreement, that L&T would be bound by and follow all applicable laws, rules and regulations of the CNMI and DOL. (Exhibit " " First Amended Complainant).

The NWA places limitations on and proscribes procedures for changing or terminating a nonresident alien contract.

Alien Rules and Regulations, Section III. Conditions of Employment, provides in pertinent parts:

> F. Notice of Termination for Cause.
> If a nonresident worker is terminated by an employer for cause before the end of the worker's contract, the employer shall give written notice to the worker and to the division at least ten (10) days prior to the worker's expected termination date. The notice shall state the name and LIIDS card number of the worker, the reasons for termination, and the expected date of departure from the Commonwealth. A copy of the termination letter and proof of service on the employee of the same must be attached to the notice.
> G. Review of Termination Notice.
> Upon receipt of a written termination notice, the director or his designee shall immediately review the reasons for termination. If the director finds that there is a question as to whether the employer has complied with relevant contractual provisions in terminating the worker or if the terminated worker files a grievance with the Division regarding the termination, the Director shall immediately initiate an investigation as set forth in Section VII.

L&T has failed to show that it gave any prior notice of the intended termination of Plaintiffs to DOL as mandated in Section III.F.

L&T in failing to give notice and comply with the procedures set forth in subsection F., denied Plaintiffs of their due process review rights under subsection G.

The "approval of the chief" (Director) is required to "change any existing contract" or to terminate Plaintiffs contracts, pursuant to 3CMC Section 4437(d), which provides:

> (d) No employer or nonresident worker shall execute any contract, make any other agreement, or change any existing contract, in writing or otherwise, regarding the employment of such worker, without the approval of the chief, and no nonresident worker shall perform labor or services within the commonwealth except pursuant to an approved contract or an approved change to this contract. Any nonresident employment contract or change thereto which has not been approved by the chief or which violates any provisions of this chapter shall, in the discretion of the chief:
> (1) Be voidable;
> (2) Be grounds for certificate revocation;

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

(3) Be grounds to disqualify an employer form further use of any nonresident labor. Emphasis added.

L&T's so-called RIF policy and rules were pretextual and not even followed or applied in the RIF/Termination of plaintiffs.

In pertinent parts L&T's RIF policy mandated that:

REDUCTION IN FORCE (RIF) POLICY, 3RD REVISION DATED JULY 08, 2004. (**Exhibit "1"** hereto).

<u>BRIEFING AFFECTING EMPLOYEES</u>
Before a reduction in force occurs, the department head provides the following information, in writing, to the employee(s) being laid off:

- The reason for the reduction in force.
- The effective date of the reduction in force (at least ten days following notification date).
- Direction to contact Human Resources for information on the following:
    - The company's policy on re-employment.
    - Completion of necessary application forms.
    - The availability of aid in seeking other employment.
- The right of permanent employees to appeal the reduction in force through the Employee Grievance and Appeal Procedure.

The prescribed notice and procedure was not applied or given to plaintiffs.

Accordingly L&T's ostensible termination of Plaintiffs was unlawful, being not in compliance with termination procedures mandated under the NWA, Alien Labor Rules and Regulations and under the Employer's Non-resident Worker Agreement, to which Plaintiffs as shown, are third-party beneficiaries, and in contravention of L&T's own written policy and rules, and breached their duty of good faith and fair dealing.

Restatement, Second, Contracts Section 205 Duty of Good Faith and Fair Dealing, see comments a. and d.

L&T has failed to make a threshold showing that its termination of Plaintiffs was in fact and reality due to and "because of economic necessity."

To the contrary L&T admits that it terminated Plaintiffs because of 'declining

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

orders." (Affidavit of Jack Torres, paragraph 21).

Additionally during his deposition Jack Torres testified that had plaintiffs been retained and paid through the expiration dates of their contract, the company would not have been caused to go out of business (Affidavit of Joe Hill)

Q Okay. Do you believe that L&T would have ah -- would have to have closed if the plaintiffs were retained through the term of their contract?
A I -- I -- can you repeat that?
Q Do you believe that L&T would have to close if the plaintiffs were retained through the ah, term of their contract?
A I don't think it would close because it's ah, we got other activities other than...[pause]--
Q I guess my question is, do you think if plaintiffs -- having to pay plaintiffs through the unexpired term of their contracts would have caused L&T to go out of business?
A I don't think so.

The so-called Performance Rating was pretextual. There was no stated performance requirements for hand packer in Plaintiffs' contracts. The facts support the inference that L&T's so-called "performance rating' was not a condition of employment and was simply pretexual to give an appearance of having met its obligations of fairness in implementing and determining which employees would or should be first subject to the RIF. (See Affidavit of Tobias).

Accordingly there are presented genuine issues of material facts as to whether there were the required "economic necessity" and/or whether the proffered grounds for termination "due to the on-going re-engineering and reduction in force due to economic necessity" were pretextual.

It is offered that "declining orders" are and were simply foreseeable risks of doing business and hence not good cause for terminating plaintiffs' contracts after only

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM.MP 96950 ~
TEL NO. (670) 234-6860/7743 ~ FAX: 234-7753

approximately two months into their annual contract.

Notably nowhere does L&T assert that because of the declining orders it could not or would not have been able to complete its annual contractual obligation to Plaintiffs non that but for the termination of Plaintiffs' contracts, L&T would not have been able to survive financially.

Q Were plaintiffs ever offered a reduced contract in lieu of ah, just termination?
A Well, I don't understand reduced contract--
Q Well, did you ever offer them, for example, go to them and say that ah, look, we're not getting orders, so we're willing to offer you a contract for three months? Two more months? And then you're out?
A That was not done.

Hence, Defendant has failed its obligation to make a prima facie showing of the occurrence of the proffered grounds supporting their termination of Plaintiffs.

## IV

## UNCONSCIONABLE CONTRACT TERMS

L&T utilized and abused its superior bargaining power/position and its position as the sole drafter of the proffered employment Contract, to insert and impose onerous terms and conditions on Plaintiffs - applicants, not usually associated with or imposed on workers.

Restatement, Second, Contracts section 206 Interpretation Against the Draftsman, Comment a.

Specifically L&T on page 3 of the Employment Agreement defined and listed as for cause terminations (1) reduction in force due to adverse economic conditions or economic necessity or (2) cessation of business or down-size of business operation.

Said grounds and factors are terms and conditions associated with traditional

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

concepts of an employer's decision to initiate a reduction in force.

On the other hand an employer's decision to implement a reduction in force is never considered as grounds giving rise to a for cause termination of the affected workers, at least Plaintiffs have been unable to find any such authority.

Implicitly, termination for cause is associated with the idea and stigma that the affected employee has failed to carry out his duties or breached his contract.

A for cause termination has an added adverse effect on the worker-plaintiffs who as a result would be prohibited from consideration for transfer relief (to another employer) 3CMC Section 4602(d).

Even assuming arguendo that the referenced conditions occurred, thus permitting L&T to asserts these events as grounds for termination, L&T's obligations under the contracts would not be discharged thereby.

Restatement, Second, Contracts Section 230 in pertinent parts provides:

> Events that terminate a duty
> (1) Except as stated in Subsection (2), if under the terms of the contract the occurrence of an event is to terminate an obligor's duty of immediate performance or one to pay damages for breach, that duty is discharged if the event occurs.
> (2) the obligor's duty is not discharged if occurrence of the event
> (a) is the result of a breach by the obligor of his duty of good faith and fair dealing....

Said terms of the contract as such should be deemed unconsciousable and unenforceable and asserted in bad faith. Restatement, Second, Contract Section 208, comment d.

V

**NOT AN INTEGRATED CONTRACT**

Jack Torres' representation that "(a)ll promises made by L&Tt to the Plaintiffs were contained within the employment contracts.," is contradicted by the proffered terms of the

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

contract itself, which provides in pertinent parts:

> " Other Provisions
> The following additional provisions apply to this contract: ... Company rules and regulations previously filed with DLI.' See page 2 of Exhibit "A", Memorandum.

Likewise, Defendant's argument that the contract is integrated is refutable and not true.

**VI**

**Return Airfare**

Defendant mischaracterizes the nature of plaintiffs' claim for the costs of return airfare in the Seventh Cause of Action.

Plaintiffs seek and requested "a declaration that defendants are obligated to pay for the costs of the return transportation of plaintiffs under their contracts and pursuant to the NWA under the Seventh Cause of Action." (First Amended Complaint, Prayer.)

It is instructive that this issue of the obligation for return airfare was presented to the jury on Special Verdict Form in Yang v. American Investment Corp. and Jerry Tan, District. N. MI C.A.No. 93-0020, in which the jury found in Form No. 6 the employer obligated to pay the return airfare.

It should be noted that American Investment Corp. was, on information an belief, an affiliate of L&T.

Accordingly there remain genuine issues of material facts precluding summary judgment on this issue in Defendant's favor.

Alternatively summary and declaratory relief prayed for plaintiffs on this claim may and should be granted to plaintiffs.

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

**VII**

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT ON FIFTH CAUSE OF ACTION (Intentional Infliction of Emotional Distress)**

Defendant's claim that "Plaintiffs' claim must fail because any alleged distress allegedly felt by the Plaintiffs is not severe enough to support a claim of intentional infliction of emotional distress is misplaced and simply begs the question.

Defendant L&T used alien-contract sewers from affiliate company, Concorde, to do hand packing work formerly done by Plaintiffs after their May 13, 2006 termination. (*See* Notice of Violation: Unauthorized Employment; Wrongful Termination of Contract, Director of Labor vs. L&T International, CAC No. 05-101-06 and Director of Labor vs. Concorde Garment MFG, CAC No. 05-100-05 attached as ***Exh. "2"*** hereof; *See* also Affidavit of Ariel M. Cruz).

Defendant L&T caused to be inserted, as a condition of each Plaintiff's contract, a provision prohibiting each Plaintiff from working for any other garment company or rendering services to any person or company dealing in products or services which compete with any products of or services of L&T, for a period of one year, after each Plaintiff's termination by L&T. L&T terminated Plaintiffs after only 2 to 3 months into their one (1) year contracts and reasonably knowing and being aware that each Plaintiffs, all being garment workers, would by said restriction, not be able to obtain employment with another garment company or service in the CNMI, and that this would cause each alien-Plaintiff severe and extreme emotional distress. Said contractual provision was part of Defendant L&T's contract of adhesion. Thus, when all the allegations of the Complaint are read and considered in a light most favorable to each Plaintiff, it can not be reasonably concluded or

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

said that a reasonable trier of fact, after considering all allegations of the Complaint, could not come to believe and decide that, given the totality of the Defendant's conduct, Defendant, under the circumstances given, Defendant's act and conduct was outrageous, severe and shocking.

Regarding Defendant L&T's insinuation that medical testimony from a physician regarding emotional distress is needed, first, expert testimony is not required for proof of intentional infliction of emotional distress. *See*, e.g. Richardson v. Fairbanks North Star Borough, 705 P. 2d 454 n. 6 (Alaska 1985) ("Expert medical testimony may be the most effective method of demonstrating the existence of severe emotional distress, but it should not be the exclusive means of ascertaining a party's mental state."). *See* McKnight v. Simpson's Beauty Supply, Inc., 86 N.C. App. 451, 454, 358 S.E. 2d 107, 109 (N.C. Ct. App. 1987) ("Our holding is simply that the jury was capable of determining without the aid of a physician or psychiatrist whether plaintiff was shocked and upset following his abrupt, unexplained dismissal and whether such feelings were caused by defendant's conduct."); Chandler v. Denton, 741 P. 2d 855, 867 (Okla. 1987) ("In most cases, jurors from their own experience are aware of the extent and character of the disagreeable emotions that may result from a defendant's outrageous conduct. Severe emotional distress may be shown either by physical manifestations of the distress or by subjective testimony.")

**CONCLUSION**

Based on the foregoing, Plaintiffs pray that Defendant's Motion for Summary Judgment be denied in its entirety. Plaintiffs further request and pray that the Court grant Summary Judgment in favor of Plaintiffs on all the causes of actions in the First Amended Complaint and declaratory judgment for return airfare on the Seventh Cause of Action.

**SIGNED** this 31st day of August, 2006.

/S/______________________
**JOE HILL**
Attorney for Plaintiffs

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

**OFFICE OF THE HR DIRECTOR**
**HUMAN RESOURCES POLICY & PROCEDURES MANUAL**

DEPARTMENT OF LABOR
Administrative Services Section
RECEIVED
Date: MAY 2005 Time:

**DATE:** July 8, 2004

**TO:** Department Managers/Heads

**CC:** Eli Arago; Connie Yeung; Steve Pixley; Colin Thompson; Rhodora Bernabe

**FROM:** Human Resources Department

**SUBJECT:** **REDUCTION IN FORCE (RIF) -** *(3rd Revision)*

---

## POLICY

Elimination or reductions in funding; reduced or changed work requirements; department reorganization; decreased workload; decrease in volume of business, discontinued functions, downturn in business volume; lack of work; a prolonged down cycle; re-engineering of processes or procedures; outsourcing functions; halt in operations; or other reasons may necessitate employee layoff for an indefinite period or a permanent reduction in force.

The company will process reduction in force either based on seniority, performance and/or qualifications of employees to meet remaining job requirements, or other specific criteria which may be deemed appropriate by the company.

1. ***Determining Priorities for Reductions.*** A reduction in force decision requires an evaluation of the need for particular positions and the relative value of specific employees so that the company can provide the highest level of service possible with a reduced work force. Determining the retention or separation of a particular employee should include an evaluation of the relative skills, knowledge, and productivity of the employee in comparison to necessary services. Length of service and other factors must be considered but may receive less weight in the determination. The department determines priority for reduction in force within the following guidelines:

- Temporary employees (TWA) in the same or related classifications must be terminated before any employee with a probationary or regular (full-time) appointment, provided that a probationary or

EXHIBIT "1"

regular (full-time) employee can perform the temporary employee's tasks.

- Employees with probationary appointments as well as trainees and apprentices *(except Workforce Investment Agency's [WIA} trainees)* with less than six months' service must be terminated before any employee in the same or a related classification with a regular (full-time) appointment, provided that the employee can perform the tasks of the probationary employee, trainee, or apprentice.
- Reduction in force of employees should be based on the following factors:
    - *Company needs*. Determine which positions are most vital to the department in the delivery of services.
    - *Relative skills, knowledge, and productivity of employees*. Personnel files and performance appraisals should be reviewed.
    - *Length of service of employees*.

Any application of the reduction in force policy must be reviewed by the affected department(s) and Human Resources and Legal Departments to determine its impact on the company's compliance with applicable laws.

2. ***Reduction in Force (RIF) Plan Approval by HRD.*** All reduction in force separations must receive prior approval from the Director or Manager of the Human Resources Department (HRD), as appropriate, to ensure compliance with company policies and procedures, and with federal and NMI laws and regulations.

3. ***RIF Plan.*** Employees may be separated as a result of a reduction in force, subject to the following provisions:

i. Prior to requesting approval from the Director or the Manager of HRD, as appropriate, the department head shall identify the position or positions to be eliminated by job classification. S/he shall then identify employees working within the department in the same or similar job classifications, and apply the following criteria to determine which employee(s) shall be separated.

a) Seniority shall govern the selection when the relative job performance of the affected employees is regarded as substantially equal.

b) Employees who received a written performance evaluation within the preceding 12 months which documents performance substantially lower than other employees with the same or similar classification titles, or who have been given a written warning for unsatisfactory job performance, or who have been disciplined for cause within the preceding 12 months period, may be considered for separation before other employees. The preceding 12 month period means the 12

months preceding the date upon which the department requested approval from HRD to implement a reduction in force.

c) Employees who have not completed their probationary period shall be separated before employees who have satisfactorily completed probation.

d) Temporary staff employees shall be separated before permanent staff employees.

ii. The boundaries of consideration for a reduction in force action shall be identified as the department, unless the Department Head receives prior approval from the Director or Manager of HRD, as appropriate, to expand or contract the boundaries for bonafide business reasons.

iii. An employee with five or more years of service at the company whose position is eliminated due to a reduction in force may be referred to Human Resources (Employment) where s/he may be referred for interviews for open positions at the same or a lower grade for which the employee is qualified. Such referral may continue for up to 45 days from the date of separation. A department having an open position may interview such an employee provided the employee meets the minimum qualifications for the position.

iv. Employees who are separated due to a reduction in force and who thereafter are rehired within three months in the same position, shall be reinstated with their original date of hire and without loss of benefit entitlement and shall not be required to serve a new probationary period. Those who are rehired after three months in the same or other position will be reinstated with cut in their tenure corresponding to the period it takes them before being rehired after their separation, and may, on a case to case basis, be required to undergo a new probationary period.

v. Permanent employees who are separated due to a reduction in force shall be given written notice of separation at least 10 days prior to the effective date of separation, or severance pay in lieu of notice. Notice is given in writing by the department head, and either delivered personally to the employee, or mailed (certified) to his/her last known address.

vi. Reestablishment of a permanent staff position which has been subject to a reduction in force action within the previous 12 months, shall require prior approval from the Director of Human Resources or his/her designee, and the respective vice president.

vii. When a position which has been subject to a reduction in force action is reestablished within 12 months of the initial reduction in force action, the employee affected by the reduction in force may be given first consideration for rehiring into the position.

## BRIEFING AFFECTING EMPLOYEES

Before a reduction in force occurs, the department head provides the following information, in writing, to the employee(s) being laid off:

- The reason for the reduction in force.
- The effective date of the reduction in force *( at least ten days following notification date).*
- Direction to contact Human Resources for information on the following:
  - The company's policy on re-employment.
  - Completion of necessary application forms.
  - The availability of aid in seeking other employment.
- The right of permanent employees to appeal the reduction in force through the Employee Grievance and Appeal Procedure.

## Effective Date

This policy (revised) shall take effect seven days from the date hereof.

Issue No.3
Ref. No.: F-HRD-029
Issue Date: 07/08/04

*diskfileref:/d\memo2k2\RIF_plcy&proc /dianne*

# COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS DEPARTMENT OF LABOR, IN THE DIVISION OF LABOR

| | |
|---|---|
| In the Matter of:<br><br>DIRECTOR OF LABOR,<br><br>Complainant,<br>Vs.<br><br>L&T International,<br>Respondent. | CAC No. 05-101-06 |
| In the Matter of:<br><br>DIRECTOR OF LABOR,<br><br>Complainant,<br>Vs.<br><br>Concorde Garment MFG ,<br>Respondent. | CAC No. 05-100-05<br><br>NOTICE OF VIOLATION: UNAUTHORIZED EMPLOYMENT; WRONGFUL TERMINATION OF CONTRACT |

Pursuant to the Nonresident Worker's Act of 1983 (3 CMC §4441 and §4444], as amended, and the Alien Labor Rules and Regulations, the Director of Labor conducted an investigation into this matter.

All parties are hereby given NOTICE that the above-numbered case has been set for hearing before the Administrative Hearing Officer on OCTOBER 11, 2005 at 9:00 a.m., at the Department of Labor, 2nd Floor Afetna Building, San Antonio, Saipan, Northern Mariana Islands, and your presence is required.

All parties are entitled to be present and to be represented by a counsel of their choosing at the hearing. All parties are further required to bring any

EXHIBIT "2"

witness, interpreter if needed, records and/or documentary evidence in support of or in opposition to the matter alleged in this DETERMINATION and NOTICE OF VIOLATION filed and issued herein.

A request for continuance from the above date must be made in writing to the Administrative Hearing Officer at least five (5) days prior to the scheduled hearing date. Continuance should be made for good cause ONLY.

Your failure to appear on this scheduled hearing date may subject you to a JUDGEMENT BY DEFAULT.

**INVESTIGATION AND FINDINGS**

These Agency Cases are the result of investigations into Reductions in Force (RIF) by Concorde Garment Manufacturing Corp., L&T Group of Companies, Ltd., Micro Pacific, Inc. and Seasonal Inc. (Respondents). In addition individual workers filed complaints regarding their termination from employment and those have been consolidated into these cases.

The documents reviewed by the Department of Labor, which initiated these Agency Cases, include the Labor Complaints that were filed and the following documents submitted by the Respondents:

Letter dated May 3, 2005 (received by the Department of Labor on May 6, 2005) from Jack Torres on Concorde letterhead to Director of Labor and Director of Immigration regarding termination of 52 workers with attached copies of the termination notices dated April 22, 2005, renewal applications and entry permits.

Letter dated May 3, 2005 (received by the Department of Labor on May 6, 2005) from Jack Torres on L&T letterhead to Director of Labor and Director