of Immigration regarding termination of 14 workers with attached copies of the termination notices dated April 13 and April 22, 2005 and entry permits.

Letter dated May 3, 2005 (received by the Department of Labor on May 6, 2005) from Jack Torres on Concorde letterhead to Director of Labor and Director of Immigration regarding termination of 8 workers with attached copies of the termination notices dated April 22, 2005.

Letter dated May 5, 2005 (received by the Department of Labor on May 6, 2005) from Joaquin Torres on Micro Pacific Inc. letterhead to Director of Labor regarding withdrawal of one worker permit with attached copy of the VOD. The departure date was April 26, 2005.

Letter dated May 5, 2005 (received by the Department of Labor on May 6, 2005) from Joaquin Torres on Concorde letterhead to Director of Labor regarding repatriation of 11 workers and requesting use of permits for replacement with attached copies of VODs.

Letter dated May 19, 2005 (received by the Department of Labor on May 19, 2005) from Jack Torres on Concorde letterhead to Director of Labor and Director of Immigration regarding termination of 2 workers with attached copies of the termination notices dated May 19, 2005.

Additional documents provided by Respondents included other notices of termination, Reduction in Force policy, matrix and payroll information.

## INVESTIGATION

On May 13, 2005 a meeting was held with Respondents through their representatives, Attorney Steve Pixley and Human Resources Director Jack Torres, regarding the Reduction in Force (RIF) notices.

Mr. Torres said that the Respondents had a written policy for RIF. Mr. Torres reports that the Respondents started cost cutting measures 3 years ago. In April 2004 they began planning for the 2005 downturn. RIF was brought up at that time. In June 2004 they discussed RIF as a last resort. He stated that if they couldn't bring down costs then they wouldn't survive.

The current RIF plan was developed in October 2004. In December 2004 they decided to RIF. In January they refined the plan. They knew at that time what departments and what positions they would RIF. At the beginning of April they decided which workers would be laid off. They used a "matrix" format. Productivity and seniority were important factors. Existing contracts were not considered.

Respondents never considered reduced hours to avoid RIF. There was nothing in the plan to offer workers an opportunity to voluntarily have an early termination of contract but Mr. Torres stated that the Respondents did offer that option. He doesn't know how many workers left voluntarily before expiration of the contracts. The Respondents did not approach the general workforce prior to expiration to see if anyone did not intend to renew.

According to Mr. Torres the Respondents' 2005 business plan is to reduce the workforce by 50%. They have no plan to reemploy any workers who were terminated. He further stated that their ultimate plan is to close their factory in Saipan and move their operation to China. He does not believe that there is any possibility for the situation to improve here. If more orders come in than they can handle here they will farm out the work to China. They are referring laid-off workers to factories in China. Mr. Torres stated that from March 2005 to the date of the meeting approximately 300 workers elected to leave.

Mr. Torres stated that there is virtually no overtime now. He agreed to provide payroll summaries. He does not think that the Respondents employ TWA workers. They do not employ manpower agencies. He stated that they exhausted all possibilities before exercising the RIF. When asked if the Respondents would have to close if the affected workers were retained through their contract he said that they would not. The Respondents never considered contracts of less than 12 months. Mr. Torres stated that there was no work for these workers and that they were idle on the job. He stated that efficiency was more important than the contract. They laid-off less efficient workers as a business decision.

## ANALYSIS

The Department of Labor reviewed the terminations for individual Respondent Companies and the positions within that company that were subject to termination. The details of the terminations are as follows.

## CONCORDE GARMENT MANUFACTURING

The following are the Concorde workers who were terminated:

| bao | zhengnian | 281897 | packer | fang | fangying | 203259 | packer |
|-----|-----------|--------|--------|------|----------|--------|--------|
| chen | haiying | 203298 | l&tfinish | feng | suyu | 283753 | packer |
| chen | chunxia | 195730 | packer | ge | zhiyan | 193686 | packer |
| chen | rong | 143959 | l&tfinish | gong | mei | 205808 | l&tfinish |
| chen | yumei | 186948 | packer | gu | meiqin | 282341 | packer |
| deng | aihua | 282599 | l&tfinish | guan | yulan | 282338 | packer |
| ding | min | 183705 | l&tfinish | guo | xueli | 195459 | |
| fan | weiqin | 280344 | packer | he | songping | 200321 | l&t finish |
| fan | hiaxia | 282591 | l&t finish | hong | defang | 165147 | l&t finish |

5

| | | | |
|---|---|---|---|
| hu | cuirong | 188390 | packer |
| huang | dongying | 186978 | packer |
| ji | bin | 186953 | packer |
| jiang | meijuan | 205183 | packer |
| jiang | mengli | 283788 | |
| jiao | fafang | 201841 | l&tfinish |
| kan | haiying | 195875 | packer |
| li | fengying | 188415 | packer |
| li | jing | 203370 | l&tfinish |
| li | jianying | 281132 | |
| li | wenbo | 194394 | packer |
| li | xiali | 203282 | packer |
| li | ping | 203754 | packer |
| liu | haihua | 200519 | packer |
| liu | shuhua | 200520 | packer |
| lu | lijun | 282425 | l&tfinish |
| lu | shuiqi | 281103 | packer |
| ma | qiaoyun | 202582 | packer |
| qian | ting | 282369 | |
| qin | longlan | 282373 | packer |
| rao | zhikun | 201836 | packer |
| ren | qiaozan | 202432 | packer |
| ruan | guangqiong | 205814 | packer |
| shen | yan | 282680 | packer |

| | | | |
|---|---|---|---|
| sun | xiuqin | 203315 | l&tfinish |
| tan | qiaoxia | 191285 | |
| wan | xuezhen | 282693 | l&t finish |
| wang | lingling | 281105 | |
| wei | congli | 203320 | |
| xu | weiwei | 203377 | packer |
| xu | fengying | 199630 | packer |
| xu | lijiao | 200554 | packer |
| xu | lanfang | 283722 | packer |
| xu | yan | 200754 | l&tfinish |
| xue | hongyun | 282703 | packer |
| yao | hongling | 283611 | packer |
| ye | xiahua | 205794 | packer |
| yu | yaqun | 199631 | packer |
| yu | hailing | 201851 | packer |
| yu | yuhong | 282841 | l&tfinish |
| yuan | jianying | 282844 | packer |
| zhang | zaiguang | 283612 | |
| zhang | xiaoli | 185126 | packer |
| zhang | shaohua | 200520 | l&tfinish |
| zheng | xiaoyan | 203848 | packer |
| zhu | guilian | 202477 | packer |

[NOTE: all the following figures are based upon information obtained from LIIDS. The data reflects information regarding hand sewers employed by Concorde. This is the same category as those subjected to RIF by that Company.]

All of the above workers were hired as sewers. At the time of the RIF, Concorde had 127 applications pending for new (off-island hires) in the same category. Mr. Torres stated that they halted those applications by letter to labor processing. After the RIF, Concorde requested, and was granted, approval to process those applications.

Within the 6 months prior to the RIF Concorde processed and obtained approval for permits for over 200 NEW workers. More than 100 were approved in 2005 alone. 43 were approved in the month prior to the RIF. Mr. Torres stated that he did not know how many were off-island hires. Department of Labor records show that they were all off-island hires.

Concorde submitted more than 650 renewal applications in the 6 months prior to the RIF with 520 this year alone. 117 renewal applications were submitted one week after the termination notices were served. When asked why they didn't just go with non-renewal Mr. Torres said that they were eliminating incompetent workers. [Note: This was not the reason stated in the termination letter.]

For the 90-day period starting from 4/22/05 (date of the bulk of RIF notices) through 7/22/05 - 394 Concorde workers' permits expired.

For the six months after 4/22/05 there are 1073 expirations.

For the month prior to the RIF there were 230 expirations.

7

In reviewing the Labor records for these Concorde workers the following facts are noted:

23 had been renewed within 3 months prior to their termination.

5 workers had three months or less left on their contract prior to termination.

25 workers had less than 6 months left on their contracts.

According to Department of Labor records, all 64 workers listed above were employees of Concorde and had permits to work as sewers for that Company. It should be noted that 56 of the workers listed above were not working at their permit-approved position at the time of their termination. It appears that their salaries were paid by Concorde but they were working on the packing and finishing line of L&T (a non-garment employer).

It is clear that Concorde had several alternatives to achieve their stated goal of reduction in workforce. The use Reduction of Force of the workers under contract was not a "last resort." In addition the lack of proper notice to the Department of Labor and the hasty repatriation of workers weighs heavily against the Respondent. The Border Management System (BMS) shows that, by May 16, 2005 (10 days after notice to the Department of Labor), 40 of the 65 terminated workers had already been repatriated.

### L&T GROUP

With respect to the following packers who were employed by L&T:

| | | | | | |
|---|---|---|---|---|---|
| eliares | estrelita | 132596 | mendez | ciela | 140400 |
| jimenez | mariza | 130530 | mora | marieta | 152406 |
| laborce | yolly | 144223 | navarrete | grace | 204847 |
| lacson | larry lario | 121644 | odon | olivia | 134418 |
| lorenzo | ma nieva | 152988 | ortizo | jessica | 155989 |

| parayno | pedro | 204319 |
|---|---|---|
| rinon | gertrudes | 158113 |

| rivera | analiza | 126886 |
|---|---|---|
| tablico | coralina | 110428 |

According to Respondent's records, at the time of the termination of these 14 workers there were a total of 119 packers on the line. These terminations must be viewed in context with the fact that of the Concorde sewers, listed above, more than 40 were actually working on the packing line of L&T at the time they were terminated.

When the Concorde sewers, working as packers, are added to the 14 terminated L&T packers, at least 54 workers were terminated from the packing line. Subtracting these 54 workers from the total of 119 working at the time of termination should have left a total of 65 packers remaining on the L&T packing line.

On May 19, 2005 the Department of Labor conducted a factory inspection of the L&T packing line. Respondents acknowledged the packing line as the area as the former workplace of the above listed packers. At the time of the inspection there were 111 Chinese workers performing packing duties. All of the workers were interviewed. None had their entry permit in their possession, but all had their Company I.D. All of the workers in this department were sewers from Concorde. Thus it appears that, within two weeks of date of termination of packers virtually all had been replaced with sewers from Concorde.

A labor check was conducted on all of the 111 workers found to be working on the L&T packing line. Of that number more than 60 were new off-island hires. Almost all began working within 6 months of the date of inspection. 47 of the 111 workers expired or were renewed within three months

9

of the RIF. Ten were renewed within one month of the RIF with half of those renewals occurring one week after the RIF.

An inspection of the "scanning" section was also conducted. This is also a division of L&T. There were 25 employees working in that section at the time of the inspection. These were broken down into 7 with "L&T" employee ID's (job classification of hand packager) and 18 Concorde workers (16 sewers and 2 pressers). Labor records for the 18 garment workers shows that 8 expired within 3 months of the RIF.

L&T's assertions about the workers' expiration dates are incorrect. The Department of Labor approved the renewals for all the L&T workers who were terminated.

The use of sewers in other positions on the packing and scanning lines demonstrates that a cutback in personnel could have been easily achieved through non-renewal of expiring garment workers rather than termination of workers under L&T contract.

It is clear in this case that L&T had several alternatives to achieve its stated goal of reduction in workforce. The termination of workers under contract was not a "last resort." With respect to the packers listed above there is sufficient evidence to conclude that they were wrongfully terminated.

With respect to other L & T workers who were terminated:

| esplana | vito | 152726 | boiler | mausig | carlito | 124289 | helper, mech |
| concubierta | celso | 130352 | carpenter | deng | cheng | 197081 | indust eng |
| shamsuzzaman | | 135886 | cleaner | chen | mingxiang | 283292 | machine rep |
| chen | fuxing | 145036 | electrician | padua | gerardo | 125607 | maintenance |
| chai | bingxiu | 280789 | expediter | xiao | guangsheng | 186648 | maintenance |

| liu | weibiao | 199660 | material exp |
|-----|---------|--------|--------------|
| pilongco | graziano | 100275 | mechanic |
| abalos | emma | 186354 | qc |
| chen | gang | 203508 | qc |

| lubrico | adelyn | 186353 | qc |
|---------|--------|--------|-----|
| perez | aurora | 116722 | qc |
| andres | ferdinand | 185102 | warehouse |

For the same reason is no justifiable basis for early termination of these contracts. As discussed above, there were reasonable means to achieve reduction of workforce without termination of workers under contract. During the period from March 1, 2005 through May 2, 2005 the Respondent submitted 15 applications for renewal of other QC workers. In addition, two other maintenance workers will expire prior to those who were terminated.

## SEASONAL, INC.

The following Seasonal, Inc employees were terminated:

| doroja | antonio | 130473 | cleaner |
|--------|---------|--------|---------|
| kadir | mohammad | 136068 | cleaner |
| mannan | md | 172178 | cleaner |
| mokter | | 135892 | cleaner |

| rahman | moklesur | 125531 | cleaner |
|--------|----------|--------|---------|
| sunuwar | padam | 148380 | cleaner |
| laborce | benjamin | 102278 | mason |

With respect to the cleaners, there are 3 workers performing the same duties whose contracts expire before those who were terminated. As discussed above, there is no justifiable basis for early termination of these contracts. Their continued employment did not impose undue financial burden upon the Respondent. There were reasonable means to achieve reduction of force without termination of these workers under contract.

## MICRO PACIFIC, INC.

The following Micro Pacific, Inc. employees were terminated:

11

| zhang | xiufang | 193790 | presser |
| li | weihong | 194243 | presser |

According to LIIDS records, within the three months prior to these terminations, the Micro Pacific was issued permits for 45 new pressers from China. They submitted 6 permit renewal applications during the same period and submitted 9 renewal applications within one week after termination of these workers. The Company had 140 pressers' permits scheduled to expire within 6 months of the termination of the above-referenced workers.

There is no justifiable basis for early termination of these contracts. Their continued employment did not impose undue financial burden upon the Respondent. There were reasonable means to achieve reduction of force without termination of these workers under contract.

## METHODOLOGY OF TERMINATION

The Respondents provided a copy of the "matrix," used to determine who would be terminated. It appears that the matrix was prepared between April 2 and April 9, 2005. This contradicts Respondents' statements that the workers to be terminated were known in January 2005. A review of the "matrix" shows a number of inconsistencies. The matrix discloses that the 14 L&T packers listed above had the lowest proficiency rating. The fact that most of the packers had recently been renewed contradicts the assertion that the workers were not meeting standards.

Through this RIF 100% of the Filipino L&T employees who were working on the packing line were eliminated. Even if it were assumed that neutral criteria were used to make the determination as to who would be fired

there is a resulting disparate impact on the Filipino workers. The workers who were interviewed feel that there was a pattern of discrimination against them. This may be borne out by the statistical improbability that all of the Filipino workers would account for the lowest productivity in their department.

It appears that the matrix was not uniformly applied in other ways. There are a number of workers with low productivity who were not terminated while more productive workers were fired. In addition it appears that workers who were employed less than one year were given preferential treatment and not terminated despite the fact that they were less productive than other workers who were terminated.

The Filipino workers also allege that they did not receive overtime while Chinese sewers consistently received it. Respondents' payroll records substantiate this allegation.

On May 16, 2005 several of the packers were interviewed. They stated that there were several meetings with Respondents' HR representatives. They reported that, before the RIF, Cory Quing (HR) told them that if they wanted to go home they should go to HR for a ticket. At the time of termination Malou Ernest (HR) told them that if they could not find work within 45 days then Immigration would look for them. After termination Cory told them that they file a Labor Complaint there was nothing that the Department of Labor could do because what the Respondents did was legal.

On May 17, 2005 two additional workers were interviewed. They confirmed the statements that were reported by the other workers. They also indicated that there were many Chinese workers in packing who received overtime while they did not.

13

On June 1, 2005 two of the terminated packers were interviewed. They stated that they were never informed that their performance was less than acceptable. They were never corrected or told to improve. They stated that production was not measured individually but by the entire table consisting of 8 to 10 people. They stated that there were many new Chinese workers on the packing line who were less productive than they were.

The Respondent alleges that there was no work for these employees yet the packing department continues to employ more than 100 workers. Interviews with the terminated workers confirm that they worked up until the date of their termination and they were never idle on the job. They state that there was always plenty of work in their department. In addition they stated that Chinese workers in that department received substantial overtime in the period leading up to the termination.

## VIOLATION OF INTER-COMPANY TRANSFER OF GARMENT WORKERS WITHOUT DOL APPROVAL

## (AND TRANSFER FROM GARMENT TO NON-GARMENT)

3 CMC 4437(e) provides that:

> A nonresident worker shall not be permitted to perform any services or labor within the Commonwealth for any employer other than the employer for whom the chief has approved an employment contract with such worker, nor may a nonresident worker perform any services or labor on a subcontract between the employer of record and any other employer, except that the chief may approve such a subcontract between the employer for a particular job with a specified duration as part of the original employment contract.

Alien Labor Rules and Regulations, Section II. J. 3. Provides that:

> Workers in the Garment industry may transfer between employers in the same industry subject to the following conditions:

a.   The transfer must be a consensual transfer as provided for by these regulations;

b.   The employer receiving the employee shall become liable for all obligations under the contract and employer's agreement.

c.   The transferring employer shall not be eligible for a replacement worker to replace an employee transferred under this section.

Alien Labor Rules and Regulations, Section II. K. 3. Provides that:

Employers in the garment industry may voluntarily agree to transfer employee positions between themselves as follows:

a.   The transferring employer and receiving employer shall notify the Department of the intention to transfer employees from one business to another, shall state the number of workers to be transferred, shall describe where the workers are to be employed, and any special arrangements such as housing, food, and transportation.

b.   The Department shall be provided a list of the employees intended to be transferred that contains the name, LIIDS number, and an acceptance of the transfer by each affected worker.

c.   No transfer shall be permitted to an employer in arrears in paying wages within the previous calendar year.   All wages and/or salaries to transferring employees must be paid in full before a transfer will be allowed.

d.   When a transfer occurs pursuant to this subsection, the transferring employer loses a worker position and the receiving employer gains a position. Positions acquired under Sections I or II may not be transferred to another employer for one calendar year. Workers occupying positions transferred under Subsections I or II may not be laid off or terminated due to a reduction in force or similar elimination of workers for one calendar year.

e.   The Department of Labor procedures and fees regarding consensual transfers shall be applied to transfers under this section.

Mr. Pixley confirmed that L&T is an entity separate from Concorde. L&T is not a garment company. L&T performed postproduction services including packing. This Company's employees were not counted toward the Garment Cap. L&T terminated its packers and replaced them with garment workers from Concorde. As these transfers were between a garment and non-garment employer they were impermissible on their face. The fact that permission from the Department of Labor was not granted is conclusive.

It appears that the Respondent has manipulated the use of their workers in violation of statute and regulation. When the Respondent wanted to maintain the highest cap possible they used the L&T Service Group to avoid those workers being included in the cap. Now that maintaining the highest cap is no longer a priority they are transferring garment workers to the service area.

In addition to the termination issues this activity raises significant question regarding violation of the 20% compliance laws and regulations. If sewers are being used to fill vacancies for packers then those positions are not being advertised and made available for resident workers.

### VIOLATION OF NOTICE REQUIREMENTS

Alien Labor Rules and Regulations, Section III. F provides that if a nonresident worker is terminated by an employer for cause before the end of the worker's contract, the employer shall give written notice to the worker and to the Division at least ten (10) days prior to the worker's expected termination date. The notice shall state the name and LIIDS card number of the worker, the reasons for termination, and the expected date of departure from the

Commonwealth. A copy of the termination letter and proof of service on the employee of the same must be attached to the notice.

When asked why the Respondent didn't give timely notice to the Department of Labor, Mr. Torres said that he was unaware of the regulation. He further argued that the law does not require it. Mr. Torres' ignorance of the regulation is not an excuse. All employers are charged with knowledge of the applicable laws and regulation. Furthermore, the earlier version of the Alien Labor Rules and Regulations (promulgated April, 1988) had a similar section that provided:

"If a nonresident worker is terminated by a employer for cause before the end of the worker's contract, the employer shall give written notice to the worker and to the Division at least ten (10) days prior to the worker's expected departure from the Commonwealth. . . . ."

It should be noted that Jack Torres was the Deputy Director of Labor when the original Regulations were promulgated.

In this case, the Respondent failed to give proper and timely notice to the Department of Labor. The notices were not served on the Department until May 6, 2005. That date was on or after the termination date for the bulk of the affected workers. The late notice prevented the Department of Labor from making a timely inquiry prior to the repatriation of workers.

In addition the termination notices did not contain the LIIDS number of the worker or the expected date of departure from the Commonwealth. In many instances there is no proof of service on the employee attached to the copy submitted to the Department.

**OVERTIME**

During the period when the RIFs were taking place, the Respondent continued to provide substantial overtime. During the month of April 2005, when most terminations took place, Concorde posted approximately 100,000 overtime hours. L&T, a significantly smaller company, posted approximately 9,000 overtime hours in that month. These figures contradict the need for RIF.

**CONCLUSION**

The Department of Labor requests that the entry permits for the terminated employees be revoked and they be granted 45 days to seek transfer relief.

The Department requests that Respondent be required to pay employee wages through the expiration of their contract or until transfer or re-hiring is accomplished.

The Department requests that a $500 penalty be imposed for each wrongful termination.

The Department requests that a $500 penalty be imposed for each improper or untimely notice of termination.

The Department requests that a $500 penalty be imposed for each improper transfer of workers from Concorde to L&T.

As of the most recent inspection L&T continues to use approximately 129 Concorde garment workers (111 packing and 18 in scanning) in their packing operation. The Department of Labor requests imposition of a $500 fine for each of these violations and an order requiring these Companies to desist from this practice.

For such other relief that the Hearing Officer deems proper.

Any party aggrieved by a finding or determination of the Director of Labor or his designee may petition for hearing before the Hearing Officer within fifteen days of the issuance of such finding or determination. If no petition is filed within the fifteen days, such finding or determination shall be unreviewable administratively.

Issued and filed on this ____ day of _____, 2005.

_____
Dean O. Tenorio
Director of Labor

Reviewed by:

_____
Assistant Attorney General

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN MARIANA ISLANDS

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO: (670) 234-6860/7743 ~ FAX: 234-7753

| | |
|---|---|
| **ABELLANOSA, JOANNA, et al.,** | **Civil Action No. 05-0010** |
| **Plaintiffs,** | |
| v. | **DECLARATION OF ROSARIO R. DE LA CRUZ IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| **L&T INTERNATIONAL CORPORATION,** | |
| **Defendant.** | |

I, ROSARIO R. DE LA CRUZ, hereby declare as follows:

1.      I am over the age of eighteen years old, have personal knowledge of the facts set forth herein, am competent to testify as to these facts if called as a witness in a court of law, and if called would testify as stated herein.

2.      I am a citizen of the Republic of the Philippines. I was hired by L&T International Corporation as a contract worker, to work in the position of Hand Packer in 2004.

3.      I worked for L&T as a Hand Packer for three (3) months, more or less, until May 13, 2004 when I, together with several other Filipinos, were told that our employment contract would be terminated for an ostensible management's decision based on reduction in force.

4.      On the day I was terminated from employment by L&T as a result of alleged reduction in force (RIF), I felt as if the whole world had fallen on me. I was shocked, in a stupor, mortified and dumbfounded. The termination left me physically and emotionally drained.

5.      On the day of the termination, I experienced dizziness, fear, headache and body

ache, sleeplessness and nausea. I realized that I needed medical treatment but I had no money or income to pay, so I delayed medical treatment. My emotional condition continued to deteriorate until my boy-friend insisted that I go to CHC in January 18, 2006, because he said I needed it and he would pay.

6.    After my treatment at CHC, the symptoms and manifestation of my emotional stress remained unabated. They grew even worse than before.

7.    I also went to Saipan Health Clinic to seek treatment.

8.    Thereafter, I also went to Pacific Medical Center for the treatment of the same health concerns.

9.    Feeling dissatisfied with my medical findings or lack of it in the CNMI, I sought treatment in the Philippines at various clinics for my continuing emotional distress. For my fare back home, my boy-friend had to borrow money from somebody else. Our friends in the island had to chip in whatever small amount they can for my pocket money.

10.    Once there in the Philippines, I approached four medical practitioners of various fields of specialization. Nobody was able to give me specific medical findings. One physician even opined that there is no need for me to undergo intensive examination as he can tell by my appearance alone, incoherent speech and strange reactions to medical treatment that I need immediate medical attention.

11.    Until now, my physician in the Philippines, Dr. Jose Llewellyn P. Salamat of The Nazarene Medical Clinic & Diagnostic Laboratory, had been giving me medical advice and medication.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on this 31st day of August, 2006.

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX. 234-7753

/s/  <u>ROSARIO R. DE LA CRUZ</u>
Declarant

3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN MARIANA ISLANDS

| | |
|---|---|
| **ABELLANOSA, JOANNA, et al.,** | **Civil Action No. 05-0010** |
| Plaintiffs, | **DECLARATION OF ARIEL M. CRUZ** |
| v. | |
| **L&T INTERNATIONAL CORPORATION,** | |
| Defendant. | |

I, ARIEL M. CRUZ, hereby declare as follows:

1.      I am over the age of eighteen years old, have personal knowledge of the facts set forth herein, am competent to testify as to these facts if called as a witness in a court of law, and if called would testify as stated herein.

2.      I am a citizen of the Republic of the Philippines. I was hired by L&T International Corporation as a nonresident contract worker, to work in the position of Hand Packer in April 2004.

3.      I worked for L&T as a Hand Packer for one (1) year until April 2005 when I was told that my contract would not be renewed because of management's reduction in force (RIF).

4.      At the time of my termination, no one from L & T offered to assist me in finding other employment or told me that they would or could assist me in getting work with affiliate companies of L&T.

5.      On many occasions and on a regular basis during the year that I worked,

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6800/7743 ~ FAX: 234-7753

I saw and worked in the same packing area of L&T with Chinese workers whose ID's I saw that showed them to be sewers from Concorde Garment Corporation, an affiliate of L&T. These sewers were working as packers in the same area with me at L&T.

6.    After my girl-friend, Ruby Carait, a Hand Packer and her group were terminated in May 2004, I saw and worked in the same packing area of L&T with Chinese sewers from Concorde who were doing the packing work and jobs formerly done by Ruby Carait and her group of co-worker.

7.    I was hired about April 22, 2004 in a batch of eight (8) Hand Packers and no one in this batch were riffed, but were each terminated by the non- renewal of their (our) one-year contracts upon expiration. See *Exhibit "A"* attached hereto and incorporated herein.

8.    Prior to signing my employment contract and at the time the contract was presented to me in the Human Resources (HR) section of L&T for signing, I was not given an opportunity or time to read the contract before signing it. The person at the window gave me the contract with the pages turned back, showing only the signature page, and pointed to where I was to sign on it, which I did, for fear of not getting the job.

9.    During my one year employment at L&T, I knew and worked with Grace Indico, also a Filipino contract worker. I knew that Grace Indico was hired under the category of hand packer but she did not do handpacking work but actually worked daily as a Scanner. I was surprised when I saw her name in L&T's 2004 RIF Matrix with a low rating. (Exhibit "C," Defendant's Memorandum). Though Grace Indico had a low rating in the 2004 RIF Matrix, she was not terminated (riffed) as she worked until the natural expiration of her contract in 2005.

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6800/7743 ~ FAX: 234-7753

2

10.    Ruby Cariat and I have lived together since 1996 and have two (2) kids. The eldest child was born January 04, 2004 shortly before Ruby began work at L&T as a Hand Packer.  The second child was born December 13, 2005.

11.    When Ruby was hired by L & T in February 2004 she was elated and so happy telling her relatives and friends about her excitement at being employed with a big and secure company.  Ruby's joy and excitement at working for L&T encouraged me to make application and seek work with L&T.

12.    Thereafter when I was hired on April 22, 2004 by L & T Ruby and I were so happy that we would be working together in the packing section of L&T. Our happiness, however, was short-lived as Ruby Carait and, her co-workers were terminated by L&T after working for only  three (3) months, more or less.

13.    I observed that Ruby became very emotionally upset and disturbed as a result of her termination of employment.  When she arrived home on May 13, 2004 she was crying uncontrollably and thereafter was restless in bed and could not sleep. Her demeanor and routine changed, I could see that her anxiety was increasing, she constantly looked depressed and spent increasingly more time calling her parents, friends and relatives especially in the Philippines talking about her termination and she would break into uncontrollable crying during these telephone conversations.  But Ruby still was always going out looking for or asking about other jobs and work.

14.    Ruby spent more and more time watching T.V. until 2 or 3 a.m. trying to fall asleep, but even then when she came to bed she was irritable and restless. She used to be, prior to the loss of her job with L & T, loving and tender in bed, but

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX. 234-7753

3

that changed even until now.

15.     The change in Ruby negatively affected our relationship so that in October 2004 we nearly broke off our relationship. Ruby was very patient and caring for me and our children before she was terminated. After the loss of her job at L&T, Ruby easily loses patience with and is quick to yell and shout at the kids and me until now.  She does not appear to be the same person before and after the loss of her work at L&T.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on this 31st day of August,  2006.


/s/          _____
                      Ariel  M.  Cruz
                      Declarant

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

4



**L&T**
Group of Companies, Ltd.

February 24, 2005

# CERTIFICATION

This is to certify that **Mr. Ariel Cruz** has been employed with this company as Hand Packager since April 23, 2004 up to present.

This certification is being issued upon the request of Mr. Cruz.

**MA. LUISA DLC ERNEST**
Human Resources Manager

Exhibit "A"