# APPENDIX

**VERIFIED/AMENDED OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT**

**ABELLANOSA, JOANNA, et al. V. L&T INTERNATIONAL CORPORATION**
**CIVIL ACTION NO. 05-0010**

**ORIGINAL**

# 1.DEPOSITION OF JACK TORRES

(Page 34, page 61, page 62, page 101, page 146, page 155, page 156, page 157, page195, page196**).**

1    A    ....and or if their work and entry permits have been

2         issued or released.

3    Q    Okay, please cancel processing of their work and entry

4         permits and or if their work and entry permits have

5         been issued slash released, okay.  Ah, what was the

6         purpose of that?

7    A    Well, it's self explanatory.  Exactly what it says.

8    Q    Okay.  Okay, let's see if we can move on to, I'm

9         looking now, I guess we can mark this separately, I

10        think these are separate documents, we'll make this

11        separate, they were produced, you gave it under your

12        No. 11 attached to it, but I think they're...[pause],

13        we'll make them separate here.  Okay, I'm looking at a

14        document dated June 26, 2003?  Ah, addressed to a Dr.

15        Joaquin A. Tenorio and appears to be from Eloy S. Inos.

16        Ah, let me ask you to look at this, Mr. Torres, and

17        tell me what that is and what it represents?

18   A    This is in response to a question that you asked me

19        whether there -- there was any other communication from

20        the company to -- to the Department of Labor regarding

21        the economic situation at that time.

22   Q    Uh-huh?

23   A    And this is it.

24   Q    Okay, and Mr. Eloy Inos is Vice President of ah, Tan

25        Holdings?  Or what.  What is it.

-34-

1              Queen -- Quin -- Quing?  And ah, Ms. Barnabe, ah, were

2              there others that were involved in the initial

3              interviews with the plaintiffs in this case?

4     A        I believe ah, Charlie So and ah, David Zheng (ph.).  Ah

5              David is no longer with us, Charlie is still with us.

6     Q        Okay, and had you given ah, your staff, had they had

7              any -- before they went into these interviews, any

8              training or ah, instructions as to ah, what to say to

9              the applicants, ah about the payment of the health

10             examination fee and health certificate fee?

11    A        There were no specific instructions with respect to

12             that particular issue, ah however, ah -- ah these

13             people, I mean my staff know ah, when the employer

14             becomes responsible and when they are not responsible.

15             We've been doing this thing for years.

16    Q        Okay, are you saying that for years you -- the

17             employees have paid for their health certificate,

18             examination fee?

19    A        For -- for initial applications?  Yes.

20    Q        And, what about the second -- okay, so if they paid for

21             the initial application, who pays for the second if

22             they renewed?

23    A        The second is paid by -- by -- by the employer, I mean

24             that's clear in the statute, that once you -- you are a

25             nonresident worker, you become a nonresident worker ah,

-61-

1       and when I say nonresident worker is -- I mean a non --

2       an alien who has a permit here, then the employer is

3       responsible for payment of medical expenses.

4  Q   So, your staff, you're confident that your staff would

5       have told the plaintiffs of this policy that you said

6       that you've been following through the years?

7  A   I'm sure of that.

8  Q   And then for the second year, ah what would your staff

9       have told the plaintiffs about payment for the second

10      year ah, health examination....

11  A   I don't--

12  Q   ....fee and ah--

13  A   I don't -- I don't think there would be any discussion

14      about second year, I mean their -- their task was to

15      prepare documents for submission ah, so I don't believe

16      any of the staff would be talking about second year.

17  Q   But you just said that that was ah, that they paid for

18      the first year--

19  A   No, you asked me whether they know and I said, yes,

20      they would know that when a -- when an employee ah,

21      either arrives here or is consensually transferred

22      here, that the employer would become responsible after

23      they receive the permit.  Before that?  The employer is

24      not responsible.  They know that.  That's what you

25      asked me, whether they know that that's -- that's the

-62-

1          MR. THOMPSON:  It's okay.

2          MR. HILL:  We will--

3          MR. THOMPSON:  Just for the record, that document

4     ...[unintelligible] these documents that have been available

5     to you for your inspection.

6          MR. HILL:  Okay.  Let me just go off--

7     OFF/ON RECORD

8          MR. HILL:  Okay, Mr. Torres, we're back on now, I'd ask

9     that you look at the ah, document that you provided ah,

10    during the break, ah entitled reduction in force, RIF, ah

11    dated April 21st, 2003.  All right, now is that the one that

12    you say that -- the RIF and the policy that was in effect

13    when plaintiffs were RIF-ed in 2004?

14    A    Yes, sir.

15    Q    Okay, and that would have been the one that you applied

16         to the plaintiffs?

17    A    Yes.

18    Q    Okay, now let me call your attention to, I'll give you,

19         show you a copy of ah, the termination letter, where is

20         that, okay, you have a copy of the termination letter

21         there, right?  Of the plaintiffs?

22    A    Yes, yes.

23    Q    Okay, and ah, now looking at that termination letter,

24         ah how many days ah, notice you have there?

25    A    Ten days.

1          orders either just shortly prior to May?  Or early May.

2     Q    Now, when plaintiffs were hired ah, in the beginning

3          part of ah, 2004, ah had there been order projections

4          made by Ms. Connie Yeung's office?

5     A    Yes.

6     Q    And, what were those projections at that time?

7     A    The projections were--

8     Q    As far as the head counts you would need?

9     A    Yes, ah she--

10    Q    For the -- for the--

11    A    She had a, ah head count requirement of approximately

12         400, that the factory needed 400 based on the -- the

13         January, February, ah projection?

14    Q    2004?

15    A    Yes.

16    Q    And, that projection was for what, over a period of a

17         year?  How long would they need this 400 for.

18    A    Well, the -- the -- the projection was based on -- on

19         the level of orders, so the -- the January and February

20         looked very good and we didn't have enough manpower, so

21         ah, hence the decision to recruit ah, because ah, we

22         were not able to deliver garments ah, on time because

23         we had a lot of orders in January and February.  Ah,

24         that's why we decided to -- to recruit because the

25         orders did not match our manning level, we needed more

-146-

1    A    Now, I believe that what -- what -- what ah -- I don't

2         think they were told that we were recruiting for

3         packers, I don't think so.  They were classified as

4         packers once -- once we were not able to ah -- they

5         were hired as packers once we were not able to -- to

6         hire ah, to recruit the -- the necessary numbers of

7         sewers and pressers.

8    Q    And, did they qualify as packers?  Or what is the

9         qualifications of a packer...[unintelligible].

10   A    Basically, that ah -- they ah -- here's what happened,

11        ah -- ah when we did not get the -- the results that we

12        wanted from both the -- the DES referral and the walk-

13        in, ah the company decided to ah, hire those that

14        responded to -- either have some experience, garment

15        experience, or were able to -- to work ah, standing, in

16        a standing position.

17   Q    The basic skills?

18   A    Ah, no, no basic skills, if they -- if they ah, have

19        basic skills?  Ah, they were hired.  If they didn't

20        have packing skills, but were able to work eight hours

21        standing?  They were selected.

22   Q    Okay, so the workers that -- the plaintiffs and the

23        workers that you were recruiting at that time as

24        packers, ah, there was no conditions preceded that they

25        had to have previous packing experience?

-155-

1    A    No, see, we didn't recruit for -- for packers.  We just

2         basically needed people to work -- to work and if they

3         didn't have -- if they had packing experience?  We

4         hired.  If they didn't have packing experience, but

5         could work standing for eight hours?  We hired.  Those

6         -- those classifications were -- were made after they

7         were selected to -- to submit them as packers.

8    Q    Well, let me ask you this then, was the plan then that

9         you would hire these persons and then train them, give

10        them some training in the packing?

11   A    Yeah, they would -- they -- they would ah -- ah yes,

12        and as a matter of fact, they did have ah, on the job,

13        they were shown how to do, do things, because--

14   Q    On the job training?

15   A    Yes.

16   Q    Now, were any of the plaintiffs terminated because they

17        didn't do their jobs right?

18   A    Not that I -- that I -- I know.

19   Q    Did you speak with Ms., ah -- all the other people in

20        the HR department about this, or?

21   A    The plaintiffs, the plaintiffs were terminated ah, as a

22        result of the reduction in force, but not from some

23        disciplinary action.

24   Q    To your knowledge, were any of the plaintiffs, ah

25        terminable for ah, any other reasons, other than

-156-

1         reduction in force?

2    A    At the time the decision was made?  No.

3    Q    What about after the time the decision was made?

4    A    I can't say because they've been terminated, I mean if

5         -- if, for instance, they -- they ah -- they can be

6         terminated for ah -- ah violation of the employment

7         contract, any of those enumerated provisions.  Let's

8         say, ah one of those or two of those violates, ah for

9         instance, ah have ah -- were engaged in altercation?

10        They would be terminated because we have zero tolerance

11        for -- for that ah -- for work place violence.

12   Q    Okay, to your knowledge, as you sit here today, was

13        there any pre-existing grounds or cause that you could

14        have terminated any of the plaintiffs for, other than

15        reduction in force?

16   A    No.

17   Q    Now, which, would you identify for me which supervisors

18        and employees were involved in selecting and

19        determining the employees to be RIF-ed?

20   A    As -- as I said yesterday, a determination on head

21        count was -- was ah, based by taking ah -- ah the 296

22        packers and ah -- ah taking the difference of the

23        projected ah -- the percentage of projected versus

24        confirmed orders for ah -- ah June.  So, it was 296

25        times 32%.  That's the formula that was used to ah,

-157-

1    Q    Does that code have a provision for regarding ah,
2         procedures in terminating employees?

3    A    Not procedures, ah grounds for terminating employees.

4    Q    Does it provide for any notice to employees ah, in any
5         -- any way?

6    A    Yes, we ah -- what it does, I -- I don't believe it
7         provides for notice, but we notify employees ah, when
8         we are terminating them not because of the code of
9         conduct, but because of the employment contract.

10   Q    So what about those employees who don't have contracts,
11        do they get notice?

12   A    They do get notice, yes.

13   Q    Are they entitled to notice?

14   A    Just like everybody else.  We give them notice as a
15        matter of practice.

16   Q    Do we have a code of conduct here?  Is that a big book
17        or just a couple of page?

18   A    No, it's probably about 5, 6 pages only.  It basically
19        states ah, the grounds for -- it basically states the
20        grounds for ah -- ah, disciplinary action.

21   Q    Okay.  Do you believe that L&T would have ah -- would
22        have to have closed if the plaintiffs were retained
23        through the term of their contract?

24   A    I -- I -- can you repeat that?

25   Q    Do you believe that L&T would have to close if the

-195-

1      plaintiffs were retained through the ah, term of their

2      contract?

3   A   I don't think it would close because it's ah, we got

4      other activities other than...[pause]--

5   Q   I guess my question is, do you think if plaintiffs --

6      having to pay plaintiffs through the unexpired term of

7      their contracts would have caused L&T to go out of

8      business?

9   A   I don't think so.

10  Q   Were plaintiffs ever offered a reduced contract in lieu

11      of ah, just termination?

12  A   Well, I don't understand reduced contract--

13  Q   Well, did you ever offer them, for example, go to them

14      and say that ah, look, we're not getting orders, so

15      we're willing to offer you a contract for three months?

16      Two more months?  And then you're out?

17  A   That was not done.

18  Q   Now, who prepared the ah, contract form for L&T?

19  A   Pardon me?

20  Q   Who prepared the contract form for L&T?  The plaintiffs

21      -- the one the plaintiffs used.

22  A   Who prepared it?

23      MR. HILL: Yes.

24  A   What do you mean, ah who prepared it.  HR prepared the

25      documents, ah--

# 2.EXHIBIT "D"

TAN HOLDINGS CORPORATION

[X] LUEN THAI APPAREL AFFILIATES - SAIPAN   [ ] LUEN THAI NON-APPAREL AFFILIATES - SAIPAN

## OFFICE OF THE HR DIRECTOR
## HUMAN RESOURCES POLICY & PROCEDURES MANUAL

**DATE:**     21st April 2003

**TO:**       Department Managers/Heads

**CC:**       Eli Arago; Connie Yeung; Steve Pixley; Colin Thompson;
              Lynn Knight; Eloy Inos

**FROM:**     Human Resources Department

**SUBJECT: REDUCTION IN FORCE (RIF)**

## POLICY

Elimination or reductions in funding; reduced or changed work requirements; department reorganization; decreased workload; decrease in volume of business, discontinued functions, downturn in business volume; lack of work; a prolonged down cycle; re-engineering of processes or procedures; outsourcing functions; halt in operations; or other reasons may necessitate employee layoff for an indefinite period or a permanent reduction in force.

The company will process reduction in force either based on seniority, performance and/or qualifications of employees to meet remaining job requirements, or other specific criteria which may be deemed appropriate by the company.

1.   ***Determining Priorities for Reductions.*** A reduction in force decision requires an evaluation of the need for particular positions and the relative value of specific employees so that the company can provide the highest level of service possible with a reduced work force. Determining the retention or separation of a particular employee should include an evaluation of the relative skills, knowledge, and productivity of the employee in comparison to necessary services. Length of service and other factors must be considered but may receive less weight in the determination. The department determines priority for reduction in force

1

EXHIBIT
"D"

within the following guidelines:

- Temporary employees (TWA) in the same or related classifications must be terminated before any employee with a probationary or regular (full-time) appointment, provided that a probationary or regular (full-time) employee can perform the temporary employee's tasks.

- Employees with probationary appointments as well as trainees and apprentices *(except Workforce Investment Agency's [WIA] trainees)* with less than six months' service must be terminated before any employee in the same or a related classification with a regular (full-time) appointment, provided that the employee can perform the tasks of the probationary employee, trainee, or apprentice.

- Reduction in force of employees should be based on the following factors:

    o *Company needs*. Determine which positions are most vital to the department in the delivery of services.

    o *Relative skills, knowledge, and productivity of employees*. Personnel files and performance appraisals should be reviewed.

    o *Length of service of employees*.

Any application of the reduction in force policy must be reviewed by the affected department(s) and Human Resources and Legal Departments to determine its impact on the company's compliance with applicable laws.

2.    ***Reduction in Force (RIF) Plan Approval by HRD.*** All reduction in force separations must receive prior approval from the Director or Manager of the Human Resources Department (HRD), as appropriate, to ensure compliance with company policies and procedures, and with federal and NMI laws and regulations.

3.    ***RIF Plan.*** Employees may be separated as a result of a reduction in force, subject to the following provisions:

    i.    Prior to requesting approval from the Director or the Manager of HRD, as appropriate, the department head shall identify the position or positions to be eliminated by job classification. S/he shall then identify employees working within the department in the same or similar job classifications, and apply the following criteria to determine which employee(s) shall be separated.

a)    Seniority  shall govern the selection when the relative job performance of the affected employees is regarded as substantially equal.

b)    Employees who received a written performance evaluation within the preceding 12 months which documents performance substantially lower than other employees with the same or similar classification titles, or who have been given a written warning for unsatisfactory job performance, or who have been disciplined for cause within the preceding 12 months period, may be considered for separation before other employees. The preceding 12 month period means the 12 months preceding the date upon which the department requested approval from HRD to implement a reduction in force.

c)    Employees who have not completed their probationary period shall be separated before employees who have satisfactorily completed probation.

d)    Temporary staff employees shall be separated before permanent staff employees.

ii.    The boundaries of consideration for a reduction in force action shall be identified as the department , unless the Department Head receives prior approval from the Director or Manager of HRD, as appropriate, to expand or contract the boundaries for bonafide business reasons.

iii.    An employee with five or more years of service at the company whose position is eliminated due to a reduction in force shall be referred to Human Resources (Employment) where s/he shall be referred for interviews for open positions at the same or a lower grade for which the employee is qualified. Such referral shall continue for up to 45 days from the date of separation. A department having an open position shall be expected to interview such an employee provided the employee meets the minimum qualifications for the position. A department accepting an employee who has been separated due to a reduction in force, or who is under notice of separation due to a reduction in force, to fill an open position shall not be required to consider other applicants.

iv.    Employees who are separated due to a reduction in force and who thereafter are rehired within three months in the same position, shall be reinstated with their original date of hire and without loss of benefit entitlement and shall not be required to serve a new probationary period. Those who are rehired after three months in the same or other position will be reinstated with cut in their tenure corresponding to the period it takes them before being rehired after their separation, and may, on a case to case basis, be required to undergo a new probationary period.

v.    Permanent  employees who are separated due to a reduction in force shall be given written notice of separation at least 15 days  prior to the effective date of separation, or severance pay in lieu of notice. Notice is given in

3

writing by the department head, and either delivered personally to the employee, or mailed (certified) to his/her last known address.

    vi.    Reestablishment of a permanent staff position which has been subject to a reduction in force action within the previous 12 months, shall require prior approval from the Director of Human Resources or his/her designee, and the cognizant vice president.

    vii.    When a position which has been subject to a reduction in force action is reestablished within 12 months of the initial reduction in force action, the employee affected by the reduction in force shall be given first consideration for rehiring into the position.

## BRIEFING AFFECTING EMPLOYEES

Before a reduction in force occurs, the department head provides the following information, in writing, to the employee(s) being laid off:

- The reason for the reduction in force.
- The effective date of the reduction in force *(at least ten days following notification date)*.
- Direction to contact Human Resources for information on the following:
    - The company's policy on priority re-employment.
    - Completion of necessary application forms.
    - The availability of aid in seeking other employment.
- The right of permanent employees to appeal the reduction in force through the Employee Grievance and Appeal Procedure.

## Effective Date

This policy shall take effect seven days from the date hereof.

Issue No.2
Ref. No.: F-HRD-029
Issue Date:  04/01/02

*diskfileref:/d\memo2k2\RIF_plcy&proc
/dianne*

4

# 3.EXHIBIT "L"

**11**

Tan Holdings Corporation

JACK S. TORRES
*Director of Human Resources*

May 13, 2004

Dr. Joaquin Tenorio, Secretary of Labor
Mr. Dean Tenorio, Director of Labor
Department of Labor
2nd Floor, Afetna Square, San Antonio
Saipan, MP 96950

DEPARTMENT OF LABOR
OFFICE OF THE SECRETARY
R E C E I V E D
Date: 7 MAY 2004
Time: 4 a  By: [signature]

Gentlemen:

### RE: L&T International Corporation
### TERMINATION NOTICE - REDUCTION IN FORCE

On June 26, 2003, we advised your office regarding our company-wide on-going re-engineering program and reduction in force due to economic necessity *(please see attached letter)*. This review process has resulted in a series of headcount reductions at *L&T International Corporation (L&T)* and we would like to inform you that the employment of the following individuals were terminated which will take effect on *May 23, 2004.* Repatriation arrangements have been made for those employees who wish to leave within the next couple of weeks and for others who wish to take full advantage of the 45 days extended stay to look for another employer.

Please cancel processing of their work and entry permits and/or if their work and entry permits have been issued/released.

| | NAME | LIIDS # | EXPIRY DATE | POSITION |
|---|---|---|---|---|
| 1 | Abellanosa, Joanna | 163744 | Mar. 16, 2004 | Packager, Hand |
| 2 | Alvarado, Marisa | 191970 | Feb. 23, 2004 | Packager, Hand |
| 3 | Antatico, Nora | 103763 | Feb. 27, 2004 | Packager, Hand |
| 4 | Apit, Loly | 281297 | Mar. 16, 2004 | Packager, Hand |
| 5 | Apostol, Leonida | 197127 | Feb. 23, 2004 | Packager, Hand |
| 6 | Aquino, Ma. Russel | 152323 | Mar. 18, 2004 | Packager, Hand |
| 7 | Aranda, Marlou | 126463 | Mar. 16, 2004 | Packager, Hand |
| 8 | Arcega, Precilla | 132486 | Mar. 09, 2004 | Packager, Hand |
| 9 | Asia, Angelita | 116893 | Mar. 09, 2004 | Packager, Hand |
| 10 | Baay, Cristina | 123519 | Mar. 04, 2004 | Packager, Hand |
| 11 | Balbido, Marissa | 121626 | Mar. 09, 2004 | Packager, Hand |
| 12 | Balcita, Amalia | 108449 | Mar. 16, 2004 | Packager, Hand |
| 13 | Balicha, Estelita | 155294 | Mar. 18, 2004 | Packager, Hand |
| 14 | Banaag, Evelyn | 157639 | Feb. 23, 2004 | Packager, Hand |
| 15 | Banguilan, Teresita | 117981 | Mar. 23, 2004 | Packager, Hand |
| 16 | Bantillo, Delma | 143374 | Feb. 24, 2004 | Packager, Hand |
| 17 | Basto, Zenaida | 103185 | Feb. 11, 2004 | Packager, Hand |
| 18 | Bautista, Consolita | 121374 | Mar. 09, 2004 | Packager, Hand |

P.O. Box 501280
Lower Base
Saipan, MP 96950
Tel: (670) 322-5451
Fax: (670) 322-9202
DID: (670) 236-2143
E-mail: jack_torres@tanholdings.com

p 1/3

EXHIBIT
"L"

| 19 | Bernardino, Eva | 154585 | Feb. 27, 2004 | Packager, Hand |
|----|-----------------|--------|---------------|----------------|
| 20 | Butic, Teresita | 137565 | Mar. 18, 2004 | Packager, Hand |
| 21 | Cabanit, Anastacia | 128709 | Feb. 23, 2004 | Packager, Hand |
| 22 | Capacite, Emerita | 173306 | Mar. 08, 2004 | Packager, Hand |
| 23 | Carait, Ruby | 107191 | Mar. 16, 2004 | Packager, Hand |
| 24 | Cava, Marita | 115313 | Mar. 09, 2004 | Packager, Hand |
| 25 | Chavez, Evangeline | 165345 | Apr. 22, 2004 | Packager, Hand |
| 26 | Concepcion, Andrea | 113804 | Mar. 09, 2004 | Packager, Hand |
| 27 | Contemplacion, Nelida | 128675 | Feb. 26, 2004 | Packager, Hand |
| 28 | Correa, Haide | 151260 | Feb. 23, 2004 | Packager, Hand |
| 29 | Cruz, Agnes | 177945 | Mar. 16, 2004 | Packager, Hand |
| 30 | Cruz, Helen | 280767 | Mar. 09, 2004 | Packager, Hand |
| 31 | Dela Cruz, Ma. Rosario | 205275 | Mar. 09, 2004 | Packager, Hand |
| 32 | Delos Santos, Elena | 135137 | Feb. 23, 2004 | Packager, Hand |
| 33 | Domine, Corazon | 103484 | Mar. 23, 2004 | Packager, Hand |
| 34 | Dugay, Nomielaida | 159068 | Mar. 16, 2004 | Packager, Hand |
| 35 | Espelarga, Jeffrey | 111747 | Mar. 03, 2004 | Packager, Hand |
| 36 | Fajarda, Amelita | 146235 | Feb. 24, 2004 | Packager, Hand |
| 37 | Gadiane, Marilyn | 196297 | Mar. 18, 2004 | Packager, Hand |
| 38 | Gases, Nenita | 128610 | Feb. 23, 2004 | Packager, Hand |
| 39 | Gelera, Eireen | 188757 | Mar. 23, 2004 | Packager, Hand |
| 40 | Gonzales, Guadalupe | 123774 | Feb. 11, 2004 | Packager, Hand |
| 41 | Hernandez, Wendeline | 151572 | Mar. 02, 2004 | Packager, Hand |
| 42 | Inopiquez, Rosalinda | 103193 | Mar. 09, 2004 | Packager, Hand |
| 43 | Ladia, Victoria | 111092 | Feb. 11, 2004 | Packager, Hand |
| 44 | Lejano, Angela | 152582 | Mar. 09, 2004 | Packager, Hand |
| 45 | Lozano, Nelia | 160161 | Mar. 18, 2004 | Packager, Hand |
| 46 | Maclang, Marideth | 154423 | Mar. 09, 2004 | Packager, Hand |
| 47 | Magalong, Josephine | 181481 | Mar. 09, 2004 | Packager, Hand |
| 48 | Magnaye, Ma. Beatriz | 115304 | Feb. 23, 2004 | Packager, Hand |
| 49 | Manzanilla, Edelita | 159160 | Feb. 27, 2004 | Packager, Hand |
| 50 | Mateo, Marla | 174817 | Feb. 18, 2004 | Packager, Hand |
| 51 | Mendoza, Belinda | 127382 | Mar. 23, 2004 | Packager, Hand |
| 52 | Miranda, Amalia | 205857 | Mar. 16, 2004 | Packager, Hand |
| 53 | Molina, Elizabeth | 150376 | Feb. 09, 2005 | Packager, Hand |
| 54 | Monsalud, Eva | 205179 | Mar. 09, 2004 | Packager, Hand |
| 55 | Nabor, Celestina | 141106 | Mar. 02, 2004 | Packager, Hand |
| 56 | Navida, Marichu | 193384 | Feb. 11, 2004 | Packager, Hand |
| 57 | Nimo, Eulalia | 120461 | Feb. 20, 2004 | Packager, Hand |
| 58 | Nipaya, Leonila | 146817 | Mar. 16, 2004 | Packager, Hand |
| 59 | Nisperos, Jenita | 200120 | Feb. 23, 2004 | Packager, Hand |
| 60 | Nueva, Marites | 127691 | Mar. 16, 2004 | Packager, Hand |
| 61 | Olermo, Ruby | 129393 | Feb. 23, 2004 | Packager, Hand |
| 62 | Pangan, Marita | 194864 | Feb. 09, 2004 | Packager, Hand |
| 63 | Pangelinan, Teresita | 143195 | Mar. 04, 2004 | Packager, Hand |
| 64 | Pascua, Dyna | 116446 | Feb. 23, 2004 | Packager, Hand |
| 65 | Pascual, Myrna | 111088 | Mar. 09, 2004 | Packager, Hand |
| 66 | Pelegrino, Adoracion | 197235 | Feb. 24, 2004 | Packager, Hand |
| 67 | Perfecto, Charito | 160280 | Mar. 09, 2004 | Packager, Hand |
| 68 | Pomarejos, Gloria | 112375 | Jan. 28, 2004 | Packager, Hand |
| 69 | Quipot, Mercia | 159256 | Mar. 02, 2004 | Packager, Hand |
| 70 | Relevante, Adora Mae | 156039 | Mar. 16, 2004 | Packager, Hand |
| 71 | Reyes, Amelia | 101788 | Feb. 23, 2004 | Packager, Hand |
| 72 | Salvador, Janna | 132066 | Mar. 09, 2004 | Packager, Hand |

| 73 | Sapiandante, Mila | 164714 | Mar. 09, 2004 | Packager, Hand |
| 74 | Soriano, Marietta | 183882 | Mar. 16, 2004 | Packager, Hand |
| 75 | Tapiador, Teresa | 100220 | Mar. 02, 2004 | Packager, Hand |
| 76 | Teberio, Jessica | 192359 | Feb. 19, 2004 | Packager, Hand |
| 77 | Tobias, Jocelyn | 101942 | May 04, 2004 | Packager, Hand |
| 78 | Valdoz, Sherowin | 282581 | Feb. 27, 2004 | Packager, Hand |
| 79 | Villanueva, Maribel | 104315 | Feb. 20, 2004 | Packager, Hand |

As always, thank you so much for your usual understanding and kind support.

Sincerely yours,

**MA. LUISA DELA CRUZ-ERNEST**
*Human Resources Manager*

cc:  Philippine Consulate Office

Attached:  as stated
*ref:/d\letters\term ntc2Labor_rif*
*/dianne*

p 3/3

# 4.EXHIBIT 'M"

Tan Holdings Corporation

"M"

June 26, 2003

Dr. Joaquin A. Tenorio
Secretary
Department of Labor
Caller Box
Saipan, MP 96950

Dear Secretary Tenorio:

The economic downturn is affecting most businesses in the Commonwealth, as well as globally. Particularly affected is our apparel manufacturing business, which is experiencing a reduction in sales due to the softening of the American market, SARS, and increasing competition from foreign countries.

To help ensure our company's survival, our companies are reviewing all departments and work processes as part of a company-wide re-engineering program to increase efficiency and reduce costs. Some of the re-structuring has or will result in a reduction in our workforce.

We have recently advised several employees that their services will no longer be needed and we expect that there will be more announcements in the near future. As this occurs, please be assured that we will follow all applicable laws and regulations, and will communicate with your Department regarding the cancellation of any contracts for foreign workers.

A reduction in our workforce is always difficult. We care very much about our employees, and at the same time are making every effort to do what is right and necessary for the survival of the business and continued employment of the majority of our workforce. We are following policies and procedures, which we believe will ensure transparency and fairness in the reduction-in-force selection process.

Thank you in advance for your understanding and support as we go through this difficult transition process.

Sincerely,

ELOY S. INOS
*Vice President*

EXHIBIT
"M"

# 5. DEPOSITION OF JOCELYN TOBIAS

(Page 199, page 200, page 201)

1    Q    she said that she cannot give it to you because of

2         management's order?

3    A    yes.

4    Q    did she say anything after that?

5    A    no.

6    Q    did she say anything else?

7    A    no.

8    Q    did you ever ask anyone else at L&t for a copy of your

9         contract?

10   A    no.

11   Q    have you, um, ever applied any job, since you lost,

12        since your termination at L&T, have you applied for

13        any work outside of the cnmi?

14   A    no.

15   Q    have you applied for any work in the Philippines since

16        you were terminated by L&T?

17   A    no.

18   Q    did you expect to have your contract renewed, um, with

19        L&T for a second year?

20   A    yes.

21   Q    why?

22   A    on my point of view I think positively I would say yes

23        because I myself is not, I worked, I believed that I

24        worked hard, not unless, ah, it's, ah, it depends on

25        the, oh, it depends on the employer because that is on

1    their hands if they're gonna renew you or not, because

2    as I've said some things changes without us, no, but

3    if you will ask me if I believe that I would be renew

4    I would positively say yes.

5  Q okay. And why would you believe that you would have a

6    renewal?

7  A why would I believe I would have a renewal, just, ah,

8    just, I just thought of it. I thought of it.

9  Q uh huh. Did anyone at L&T ever promise you that they

10    would renew your contract after one year?

11  A no, but, ah, I, I thought of it because they were

12    telling us the point that on the first, ah, on the

13    first year with regards to medical they said that we

14    will be shouldering, the second year for our renewal

15    they will be the ones to be,

16  Q shoulder?

17  A yes.

18  Q okay.

19  A be shouldering it or be taking it.

20  Q did someone tell you that?

21  A yes.

22  Q who, who told you that?

23  A the people from HR.

24  Q who, you don't know the name?

25

1   A   Baby Lopez and, ah, the other lady, the one we

2        encounter on the window.

3   Q   uh huh. So 2 different people told you that?

4   A   yes.

5   Q   okay. When did Baby Lopez tell you that?

6   A   I don't remember anymore.

7   Q   you don't, how do you remember that she told you?

8   A   I, I knew that she told me that but I don't know the

9        exact dates anymore.

10   Q   did she tell you that before you signed your contract,

11        employment contract?

12   A   yes, before.

13   Q   okay. Did she tell you that in person or over the

14        telephone?

15   A   in person.

16   Q   okay. So you met with Baby twice in person before you

17        signed your employment contract, is that right?

18   A   it's not her but there's 2 of them as I said, they

19        alter.

20   Q   did, do you remember Baby Lopez telling you that, um,

21        that you would be responsible for your health

22        certificate the first year and L&T would pay for it in

23        the second?

24   A   yes, the other lady and Baby told that.

25   Q   to you?