FILED
Clerk
District Court

SEP 2 9 2006

For The Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| **ABELLANOSA, JOANNA, et al.,** | Civil Action No. 05-0010 |
| Plaintiffs, | |
| v. | **DECLARATION IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| **L&T INTERNATIONAL CORP.,** | |
| Defendant. | |

I, NORA ANTATICO, hereby declare as follows:

1.    I am over the age of eighteen years old, have personal knowledge of the facts set forth herein, am competent to testify as to these facts if called as a witness in a court of law, and if called would testify as stated herein.

2.    On or about February, 2004, I went to L&T to apply for an advertised job vacancy for hand packers. After filling up the application form, I was told to report to the office of Corazon "Cory" Quing for interview, which I did.

I.
MEDICAL FEES
(Physical Examination Fee
and Health Certificate Fee)

3.    During my interview, Cory Quing asked me who was my employer and if I was willing to transfer to L&T. I told her who my employer was and yes, I was willing to transfer to L&T and my job category with my present employer was that of a houseworker. Cory Quing also asked me if I had my medical examination and I said yes. She replied that it is okay and L&T will be the one to pay for my medical examination and health certificate for the following year.

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

ORIGINAL

1   Upon hearing that, I was elated because of the possibility of employment

2   renewal.

3   4.    After the interview with Cory Quing, I, together with several others, were

4   told to report to another L&T personnel who later on, I came to know to be

5   Amy Tse. Amy Tse asked us if we can do the job required for a packager at the

6   same time explained to us what is the nature of a hand packager's job.

7   Thereafter, I, together with my companions, were told that L&T would hire us

8   and we just have to wait for a call regarding the requirements we had to

9   submit.

10  5.    A few days later, I got a call from L&T asking me to report to HR office.

11  When I arrived at HR I met with Baby Lopez, who identified herself as an HR

12  staff person.   Baby gave me and asked me to complete the Consensual

13  Transfer documents and have my employer to complete and sign them, which

14  I did. I gave the completed consensual transfer documents to Baby Lopez at

15  the HR office.   Baby Lopez then asked for my health certificate which she

16  noted had not yet expired. As to the rest of the applicants whose health

17  certificate had expired or already expiring, Baby told them that they would

18  need to get a new medical examination and health certificate before their

19  employment application/documentation could be completed and processed.

20  Baby told them to go to Marianas Medical Center to get the examination. She

21  even told our group to mention that they are from L&T to get discount at

22  Marianas Medical Center.   When  asked how the medical examination and

23  health certificate are going to be paid for, Baby said you pay for it now  and on

24  your renewal L&T will pay.  I understood this to mean that if I did my job and

25  not violate any company rules, that I would be renewed for a second year and

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX. 234-7753

2

1   that during that second year L&T would pay/repay for the health examination
2   and health certificate fees.    Upon hearing what Baby said echoing or
3   confirming what Cory Quing earlier told us, I felt more excited to work for L&T
4   as I felt assured of at least two years of employment.

5

6                                    II.
                             CONTRACT SIGNING

7

8   6.    My first non-resident contract was in 1994.   Basically, annually since
    then, each year, my employers used and had me sign a standard form labor
9   contract provided by DOL. I became familiar with the basic terms of the DOL
10  standard form contract. A copy of such standard form contract is attached as
11  Exhibit "2" to Plaintiffs' Verified/Amended Opposition.

12  7.    In 2004, when L&T HR staff Baby Lopez handed me their contract form,
13  with only the signature page showing , and insisting that I sign, I had no
14  reason to believe it was not the standard DOL form contract.  Prior to signing
15  this L&T contract form and at the time it was presented to me in the HR for
16  signing, I was not given an opportunity to read the contract before signing it.
17  When it was presented to me in the HR office, Baby Lopez just showed the
18  document  with the pages turned back, showing only the signature page, and
19  pointed to where I was to sign it, and said sign, which I did without reading
20  it. Baby was rushing me and other applicants by insisting that I and the other
21  applicants I saw present, hurry up and quickly sign, without delaying the
22  document processing. At that time Baby was urging us to sign, she was so
23  busy attending to so many things and inquiries inside her office. From the
24  mood and way the HR staff was acting, I was made fearful that if I didn't just

25

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX. 234-7753

                                    3

sign the signature page as instructed, I would lose the job opportunity especially since none of the other applicants I saw there held up the line by or took time to read the contract document. I observed the HR staff acting the same way with other workers who signed before and after my turn. Neither Baby Lopez, nor any one else, ever showed me my contract document until the time and date they asked me (us) to sign at HR. I was never given a copy of the L&T contract document I signed before my termination on or about May 13, 2004. After my termination I was surprised when I later learned of some of the conditions and terms in L&T's self-styled contract. Had I known that the contract contained terms restricting me from being employed with other competing companies in Saipan and allowing L&T to terminate me at any time as a reduction in force, I would not have agreed to it or signed.

III.
PERFORMANCE EVALUATION

8. There was no individualized measurement or testing to determine my or each Packer's individual performance or production. The only production measurement or test was done by counting the output (production) from each of the different lines of Packers. There was really no way for me as an individual packer to control or show an increase in the number of products because I was just one individual on the line with many others. In the packing section our work was performed by groups of workers on so-called lines. The packages or items we were assigned to work on often varied from day to day. Our Head Supervisor in the packing section was Tse, Oi Ling, who is Chinese. When I and other Filipino workers tried to ask her questions

4

regarding our work she could not answer nor explain because she does not speak english fluently. (*See* Defendant's Response to Plaintiffs' First Set of Request for Interrogatories No. 49a).

IV.
TERMINATION

9. I was employed and worked for L&T International Corporation as a hand packer, from on or about March 2004 to May 13, 2004, when I and other workers in the hand packing section were summoned by the calling of our individual names over the public address system, to report to the Human Resources (HR) office. I believe and understand we were called in two batches, one about 3:00 p.m. and one about 5:00 p.m. (*See* Deposition of Jack Torres, page 97, lines 14-17).

10. I did not know why we were being called to come to HR. I thought that we were being called regarding receipt of our anticipated ATM Cards that L&T had previously given us and had us fill out an application for, as they told me and other workers present, to make it easier and more convenient for (us) workers to access and get our anticipated bi-weekly wage payments without having to stand in line waiting for and trying to cash payroll checks. I was made more assured of my continued employment and anticipated pay check by L&T having asked me and other workers to set up these ATM accounts to facilitate our anticipated payroll check payments.

11. As we arrived at the designated meeting room, I observed other workers, and Corazon Quing, Malou Ernest and Rhodora Bernabe, known to us as HR staff, were present at the May 13, 2004 meeting.

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX. 234-7753

5

12. I did not see or hear Corazon Quing read or reading from any document or the so-called "communication plan" as described and stated in Exhibit "A" attached to the Declaration of Corazon Quing.

13. More specifically, I (we) were not told as stated by Corazon Quing that we the workers, had the right to appeal our termination to the "Legal Department" of L&T or to any one else.

14. Neither Malou Ernest, Corazon Quing nor any one else at the May 13, 2004 meeting, informed us, that the purpose of the so-called second check was "to cover for 10 days pay in lieu of notice," as stated in paragraph 7, Declaration of Corazon Quing. Additionally, L&T's own RIF policy required, as proposed RIF workers, that I (we) be given "written notice of separation at least 15 days prior to the effective date of separation, or severance pay in lieu of notice." (*See* Ex. "D" Deposition of Torres, and page 88 lines 6-8 and lines 20-24).

15. It was my honest belief that I and my co-workers were terminated on May 13, 2004 and that the termination was effective immediately on and from May 13, 2004, because I (we) were told by HR staff at the May 13, 2004 meeting that today (May 13, 2004) was our last day of employment and they demanded that we give up and turn in our company ID cards which were required and needed for company employees to freely enter company premises; and more importantly, our I.D.s were swipe-cards for the time-clocks so we could not clock in or out without them, in addition to being required to "turn over any and all company properties in your possession... on or before May 13, 2004" as stated in the Notice of Termination. (*See* Ex. "D," Defendant's Memorandum).

6

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7153

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

16.    As a result I believed and felt that I was terminated and forced to stop working on May 13, 2004, the same date that the Notice of Termination (dated May 12, 2004) was given to me.  Hence, I was not given the required prior notice of termination and/or of the RIF.

17.    I and the other plaintiffs worked a set work schedule and shift, and worked Monday through Saturday, seven (7) hours a day, six (6) days a week, for a total of forty-two (42) hours each work week, which included two (2) hour overtime each work week while employed at L&T.

V.
EMOTIONAL DISTRESS

18. The termination, being announced and coming as it did without any prior notice, counseling or discussion about employment options with other companies or L&T caused me severe shock and I was dumbfounded. The termination left me physically and emotionally drained.

19.    I became very emotionally upset and disturbed as a result of the termination of my employment at L&T. The way L&T broke the news of termination to us, not individually or privately, but *en masse* in front of all the other employees, resulted in wailing, crying and shouting and pandemonium among the workers present; I and the other workers present were crying and hugging each other and trying to console one another.

20.    For several months after L&T terminated my employment, I was too embarrassed and ashamed to go to gatherings of friends and acquaintances because of fear of being asked about my sudden firing and termination by L&T. I felt like a social outcast.  There was a time I sent my daughter to

school.  Upon seeing me, my daughter's classmates asked her where is her mom working.  I can clearly recall that my daughter responded rather innocently that I was not working because I got terminated.  Upon hearing those words, I felt so ashamed of myself and useless.

27.  When I looked back at termination from L&T, I broke down and was crying hysterically and uncontrollably and could not sleep.  I used to be very patient and caring for my family, especially for our child before I was terminated. After the loss of my job at L&T, I easily lose patience with and am quick to yell and shout at our daughter and my partner until now.  I notice and feel that I am not the same person before and after the loss of my job at L&T.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this 26th day of September, 2006.

/S/ _____

Nora T. Antatico
Declarant

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX. 234-7753

8