*14*

F I L E D
Clerk
District Court

SEP 2 9 2006

For The Northern Mariana Islands
By_____
(Deputy Clerk)

IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

ABELLANOSA, JOANNA,
et al.,

    Plaintiffs,

v.

L&T INTERNATIONAL
CORPORATION,

    Defendant.

Civil Action No. 05-0010

DECLARATION IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

I, TERESITA BANGUILAN, hereby declare as follows:

1.      I am over the age of eighteen years old, have personal knowledge of the facts set forth herein, am competent to testify as to these facts if called as a witness in a court of law, and if called would testify as stated herein.

2.      I am a citizen of the Republic of the Philippines. I was hired by L&T International Corporation as a nonresident contract worker, to work in the position of Hand Packer in 2004.

3.      On or about January, 2004, I went to L&T to apply for an advertised job vacancy for hand packers. After filling-up and turning in the application form, I was told that L&T will call me for further information.

4.      After about two weeks, an L&T personnel who identified herself as Baby Lopez, called me up for interview. When I reported to L&T, a certain Cory Quing and Amy Tse conducted the interview.

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6800/7743 ~ FAX: 234-7753

ORIGINAL

1

2

3

4

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

## I.
## MEDICAL FEES
(Physical Examination Fee
and Health Certificate Fee)

5.    After I passed the interview, Baby Lopez asked me to complete the

Consensual Transfer documents and have my employer complete and sign them,

which I did. I gave the completed consensual transfer documents to Baby Lopez

at the HR office. Baby Lopez then asked for and I gave her my health certificate

which she noted had not yet expired. She told me that L&T would use my health

certificate from my then employer.

## II.
## CONTRACT SIGNING

6.    My first non-resident contract was in 1991.  Basically, annually since then,

each year, my employers used and had me sign a standard form labor contract

provided by DOL. I became familiar with the basic terms of the DOL standard

form contract. A copy of such standard form contract is attached as Exhibit "2"

to Plaintiffs' Verified/Amended Opposition.

7.    In 2004,  when L&T HR staff Baby Lopez handed me their contract form,

with only the signature page showing , and insisting that I sign, I had no reason

to believe it was not the standard DOL form contract.  Prior to signing this L&T

contract form and at the time it was presented to me in the HR for signing, I was

not given an opportunity to read the contract before signing it. When it was

presented to me in the HR office, Baby Lopez just pushed the document through

the counter-window with the pages turned back, showing only the signature page,

2

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX. 234-7753

1  and pointed to where I was to sign it, and said sign, which I did without reading

2  it.  There were many other applicants present and waiting in line. The HR staff

3  was rushing me and other applicants by insisting that I and the other applicants

4  I saw present, hurry up and quickly sign, without delaying the document

5  processing.  From the mood and way the HR staff was acting, I was made fearful

6  that if I didn't just sign the signature page as instructed, I would lose the job

7  opportunity especially since none of the other applicants I saw there held up the

8  line by or took time to read the contract document.  I observed the HR staff

9  acting the same way with other workers who signed before and after my turn.

10  Neither Baby Lopez,  nor any one else, ever showed me my contract document

11  until the time and date they asked me (us) to sign at HR.  I was never given a copy

12  of the L&T contract document I signed before my termination on or about May

13  13, 2004.  After my termination, I was surprised when I later learned of some of

14  the things and terms in L&T's self-styled contract.  Had I known that the L&T's

15  self-styled contract contained terms restricting me from being employed

16  with other competing companies in Saipan and allowing L&T to terminate

17  me at any time as a reduction in force, I would not have agreed to it or

18  signed it.

19

20                                      III.
                          PERFORMANCE EVALUATION

21  8.  There was no individualized measurement or testing to determine my or each

22  Packer's individual performance or production.  The only production

23  measurement or test was done by counting the output (production) from each of

24  the different lines of Packers.  There was really no way for me as an individual

25

                                        3

packer to control or show an increase in the number of products because I was just one individual on the line with many others. In the packing section our work was performed by groups of workers on so-called lines. The packages or items we were assigned to work on often varied from day to day. Our Head Supervisors in the packing section were Li, Zhi Min, Wu, Duan Huai and Cao, Li Qun, who are Chinese. When I and other Filipino workers tried to ask them questions regarding our work they could not answer nor explain because they do not speak English fluently. *(See* Defendant's Response to Plaintiffs' First Set of Request for Interrogatories No. 49a).

## IV.
## TERMINATION

9. I was employed and worked for L&T International Corporation as a hand packer, from on or about February 2004 to May 13, 2004, when I and other workers in the hand packing section were summoned by the calling of our individual names over the public address system, to report to the human resources (HR) office. I believe and understand we were called in two batches, one about 3:00 p.m., and one about 5:00 p.m. *(See* Deposition of Jack Torres, page 97, lines 14-17).

10. I did not know why we were being called to come to the Conference Room. I thought that we were being called regarding receipt of our anticipated ATM Cards that L&T had previously given us and had us fill out an application for, as they told me and other workers present, to make it easier and more convenient for (us) workers to access and get our anticipated bi-weekly wage payments without having to stand in line waiting for and trying to cash payroll checks. I was

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX. 234-7753

1    made more assured of my continued employment and anticipated pay check by
2    L&T having asked me and other workers to set up these ATM accounts to
3    facilitate our anticipated payroll check payments.

4    11.    As we arrived at the designated meeting room, I observed other workers,
5    and Corazon Quing, Malou Ernest and Rhodora Bernabe, known to us as HR
6    staff, were present at the May 13, 2004 meeting.

7    12.  I did not see or hear Corazon Quing read or reading from any document or
8    the so-called "communication plan" as described and stated in Exhibit "A"
9    attached to the Declaration of Corazon Quing.

10    13.    More specifically, I (we) were not told as stated by Corazon Quing that we
11    the workers, had the right to appeal our termination to the "Legal Department"
12    of L&T or to any one else.

13    14.  Neither Malou Ernest, Corazon Quing nor any one else at the May 13, 2004
14    meeting, informed us, that the purpose of the so-called second check was "to
15    cover for 10 days pay in lieu of notice," as stated in paragraph 7, Declaration of
16    Corazon Quing.  Additionally, L&T's own RIF policy required, as proposed RIF
17    workers, that I (we) "shall be given written notice of separation at least 15 days
18    prior to the effective date of separation, or severance pay in lieu of notice." (*See*
19    Ex. "D," Jack Torres' Deposition, and page 88, lines 6-8 and lines 20-24).

20    15.    It was my honest belief that I and my co-workers were terminated on May
21    13, 2004 and that the termination was effective immediately on and from May 13,
22    2004, because I (we) were told by HR staff at the May 13, 2004 meeting that today
23    (May 13, 2004) was our last day of employment and they demanded that we give
24    up and turn in our company ID cards which were required and needed for
25    company employees to freely enter company premises; and more importantly, our

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX. 234-7753

5

I.D.s were swipe-cards for the time-clocks so we could not clock in or out without them, in addition to being required to "turn over any and all company properties in your possession... on or before May 13, 2004" as stated in the Notice of Termination. *See* Ex. "D," Defendant's Memorandum.

16.   As a result I believed and felt that I was terminated and forced to stop working on May 13, 2004, the same date that the Notice of Termination (dated May 12, 2004) was given to me.  Hence, I was not given the required prior notice of termination and/or of the RIF.

17.   I and the other plaintiffs worked a set work schedule and shift, and worked Monday through Saturday, seven (7) hours a day, six (6) days a week, for a total of forty-two (42) hours each work week, which included two (2) hour overtime each work week while employed at L&T.

18.   At the time of my termination, no one from L&T offered to assist me in finding other employment or told me that they would or could assist me in getting work with affiliate companies of L&T.

V.
EMOTIONAL DISTRESS

19.  I became very emotionally upset and disturbed as a result of the termination of my employment at L&T.  The way L&T broke the news of termination to us, not individually or privately, but *en masse* in front of all the other employees, resulted in wailing, crying and shouting and pandemonium among the workers present; I and  the other workers present were crying and hugging each other and trying to console  one  another.

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX. 234-7753

20.  After my termination on May 14, 2004, I started to cry day and night. I was so sad and worried.  I did not have any money to support my self.  I keep on thinking why L& T terminated me so suddenly.  I thought L&T was a big and stable company that can afford to give us jobs.

21.    I began to have constant head ache and felt all kinds of body pains. I could not go to the doctor for a medical check up because I did not have any money.

22.  I already sold anything I own that has value. All the jewelry I had were either pawned or already sold.

23. I had a job as a commercial cleaner at Island Janitorial Services before I applied at L&T.  If I had stayed with my old job, I would not have experienced this severe emotional distress that L&T had caused me to suffer.  I have had several employers before but nobody, but L&T, had caused me so much pain and trouble. With L&T's reputation in the island, I thought it would never do the deplorable thing it did to us.

24.  When I was hired by L&T, I was so happy telling my relatives and friends about my excitement and being employed with such big and secure company. My happiness, however, was short-lived as we were terminated after only two months, more or less, of employment.

     I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this 29th day of September, 2006.

7

1

2

3

4

5    _____
     BANGUILAN, TERESITA

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

8.