FILED
Clerk
District Court /9

SEP 2 9 2006

For The Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE**
**NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| **ABELLANOSA, JOANNA, et al.,** | Civil Action No. 05-0010 |
| Plaintiffs, | |
| v. | **DECLARATION IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| **L&T INTERNATIONAL CORP.,** | |
| Defendant. | |

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

ORIGINAL

I, TERESITA BUTIC, hereby declare as follows:

1.     I am over the age of eighteen years old, have personal knowledge of the facts set forth herein, am competent to testify as to these facts if called as a witness in a court of law, and if called would testify as stated herein.

2.     On or about January, 2004, I went to L&T to apply for an advertised job vacancy for hand packers. After filling up the application form, I was told that L&T would just call me for further information.

I.
MEDICAL FEES
(Physical Examination Fee
and Health Certificate Fee)

3.     A few days later, I got a call from L&T asking me to report to HR office for an interview. After the interview, I was informed that L&T would just call me for further information. When called, I reported to L&T and was told to undergo medical examination. Baby told me to go to Marianas Medical Center to get the examination. Because Marianas Clinic was very far from L&T and I knew

clinics that were close, I asked her why Marianas Medical Center.  She said that is the one L&T uses and L&T applicants get a cheaper rate, only $35.00. I knew that other clinics charge between $45.00 to $55.00 for medical examination. I asked her how the medical examination and health certificate are going to be paid for. Baby Lopez said you pay for it now  and on your renewal L&T will pay.  I understood this to mean that if I did my job and not violate any company rules, that I would be renewed for a second year and that during that second year L&T would pay/repay for the health examination and health certificate fees. I was not paid for my services and time spent getting the medical examination and health certificate.

.

## II.
## CONTRACT SIGNING

4.    My first non-resident contract was in 1991.  Basically, annually since then, each year, my employers used and had me sign a standard form labor contract provided by DOL. I became familiar with the basic terms of the DOL standard form contract. A copy of such standard form contract is attached as Exhibit "2" to Plaintiffs' Verified/Amended Opposition.

5.    In 2004,  when L&T HR staff Baby Lopez handed me their contract form, with only the signature page showing , and insisting that I sign, I had no reason to believe it was not the standard DOL form contract.  Prior to signing this L&T contract form and at the time it was presented to me in the HR for signing, I was not given an opportunity to read the contract before signing it. When it was presented to me in the HR office, Baby Lopez just pushed the document through the counter-window with the pages turned back, showing

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

2

only the signature page, and pointed to where I was to sign it, and said sign, which I did without reading it. The HR staff was rushing me and other applicants by insisting that I and the other applicants I saw present, hurry up and quickly sign, without delaying the document processing.  From the mood and way the HR staff was acting, I was made fearful that if I didn't just sign the signature page as instructed, I would lose the job opportunity especially since none of the other applicants I saw there held up the line by or took time to read the contract document.  I observed the HR staff acting the same way with other workers who signed before and after my turn.  Neither Baby Lopez, nor any one else, ever showed me my contract document until the time and date they asked me (us) to sign at HR.  I was never given a copy of the L&T contract document I signed before my termination on or about May 13, 2004. After my termination I was surprised when I later learned of some of the terms and conditions in L&T's self-styled contract.  Had I known that L&T self-styled contract contained terms restricting me from being employed with other competing companies in Saipan and allowing L&T to terminate me at anytime as a reduction in force, I would not have agreed to it or signed it.

### III.
### PERFORMANCE EVALUATION

6.    There was no individualized measurement or testing to determine my or each Packer's individual performance or production. The only production measurement or test was done by counting the output (production) from each of the different lines of Packers. There was really no way for me as an individual packer to control or show an increase in the number of products

3

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7153

1 because I was just one individual on the line with many others.  In the

2 packing section our work was performed by groups of workers on so-called

3 lines.  The packages or items we were assigned to work on often varied from

4 day to day.  Our Head Supervisor in the packing section was Cao, Li Qun, who

5 is Chinese.  When I and other Filipino workers tried to ask her questions

6 regarding our work she could not answer nor explain because she does not

7 speak english fluently.  (*See* Defendant's Response to Plaintiffs' First Set of

8 Request for Interrogatories No. 49a).

9

10                                    IV.
                                TERMINATION

11 7.  I was employed and worked for L&T International Corporation as a hand

12 packer until May 13, 2004, when I and other workers in the hand packing

13 section were summoned by the calling of our individual names over the public

14 address system, to report to the Human Resources (HR) office. I believe and

15 understand we were called in two batches, one about 3:00 p.m. and one about

16 5:00 p.m. (*See* Deposition of Jack Torres, page 97, lines 14-17).

17 8.   I did not know why we were being called to come to HR.  I thought that

18 we were being called regarding receipt of our anticipated ATM Cards that L&T

19 had previously given us and had us fill out an application for, as they told me

20 and other workers present, to make it easier and more convenient for (us)

21 workers to access and get our anticipated bi-weekly wage payments without

22 having to stand in line waiting for and trying to cash payroll checks.  I was

23 made more assured of my continued employment and anticipated pay check

24

25

4

by L&T having asked me and other workers to set up these ATM accounts to facilitate our anticipated payroll check payments.

9.   As we arrived at the designated meeting room, I observed other workers, and Corazon Quing, Malou Ernest and Rhodora Bernabe, known to us as HR staff,  were present at the May 13, 2004 meeting.

10.  I did not see or hear Corazon Quing read or reading from any document or the so-called "communication plan" as described and stated in Exhibit "A" attached to the Declaration of Corazon Quing.

11.   More specifically, I (we) were not told as stated by Corazon Quing that we the workers, had the right to appeal our termination to the "Legal Department" of L&T or to any one else.

12.   Neither Malou Ernest, Corazon Quing nor any one else at the May 13, 2004 meeting, informed us, that the purpose of the so-called second check was "to cover for 10 days pay in lieu of notice," as stated in paragraph 7, Declaration of Corazon Quing.  Additionally, L&T's own RIF policy required, as proposed RIF workers, that I (we) be given "written notice of separation at least 15 days prior to the effective date of separation, or severance pay in lieu of notice." (*See* Ex. "D" Deposition of Torres, and page 88 lines 6-8 and lines 20-24).

13.   It was my honest belief that I and my co-workers were terminated on May 13, 2004 and that the termination was effective immediately on and from May 13, 2004, because I (we) were told by HR staff at the May 13, 2004 meeting that today (May 13, 2004) was our last day of employment and they demanded that we give up and turn in our company ID cards which were required and needed for company employees to freely enter company premises; and more

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

5

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

importantly, our I.D.s were swipe-cards for the time-clocks so we could not clock in or out without them, in addition to being required to "turn over any and all company properties in your possession... on or before May 13, 2004" as stated in the Notice of Termination. (*See* Ex. "D," Defendant's Memorandum).

14.   As a result I believed and felt that I was terminated and forced to stop working on May 13, 2004, the same date that the Notice of Termination (dated May 12, 2004) was given to me.   Hence, I was not given the required prior notice of termination and/or of the RIF.

15.   I and the other plaintiffs worked a set work schedule and shift, and worked Monday through Saturday, seven (7) hours a day, six (6) days a week, for a total of forty-two (42) hours each work week, which included two (2) hour overtime each work week while employed at L&T.

15. At the time of my termination, no one from L&T offered to assist me in finding other employment or told me that they would or could assist me getting work with affiliate companies of L&T.

V.
EMOTIONAL DISTRESS

16.   The termination, being announced and coming as it did without any prior notice, counseling or discussion about employment options with other companies or L&T caused me severe shock, as a result I began to experience pains in my chest that has continued until now.   As a result of these chest pains I have difficulty breathing freely and experience shortage of breathe.

17.   In addition to chest pains and breathing problems, I worried and could

6

not stop thinking of the loss of work and livelihood. I could not sleep during the first few weeks after the firing. Even now I can not sleep soundly and wake up in the middle of the night worrying and thinking about how I am going to feed and provide for my kid.

18. The way L&T broke the news of termination to us, not individually or privately, but *en masse* in front of all the other employees, resulted in wailing, crying and shouting and pandemonium among the workers present; I and the other workers present were crying and hugging each other and trying to console one another.

19. For several months after L&T terminated my employment, I was too embarrassed and ashamed to go to gatherings of friends and acquaintances because of fear of being asked about my sudden firing and termination by L&T. I felt like a social outcast. Physically and emotionally, I felt drained due to severe emotional distress caused by termination by L&T.

20. When I arrived home on May 13, 2004, I broke down and was crying hysterically and uncontrollably and could not sleep.

21. As a result, my demeanor and routine changed. My anxiety increased, I constantly looked depressed and spent increasingly more time calling my friends and relatives especially in the Philippines talking about my termination and I would then break into hysterical and uncontrollable crying during these telephone conversations. For months, I was fixated on the termination incident and became irritable, hostile and aggressive.

22. I noticed and felt that I am not the same person before and after the termination of my employment at L&T.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this 28th day of September, 2006.

7

1

2

3

4

5

_____
BUTIC, TERESITA

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

8