FILED
Clerk
District Court

SEP 29 2006

For The Northern Mariana Islands
By_____
(Deputy Clerk)

IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

| | |
|---|---|
| ABELLANOSA, JOANNA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>L&T INTERNATIONAL CORPORATION,<br><br>Defendant. | Civil Action No. 05-0010<br><br>DECLARATION IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

I, ANDREA CONCEPCION, hereby declare as follows:

1. I am over the age of eighteen years old, have personal knowledge of the facts set forth herein, am competent to testify as to these facts if called as a witness in a court of law, and if called would testify as stated herein.

2. I am a citizen of the Republic of the Philippines. I was hired by L&T International Corporation as a nonresident contract worker, to work in the position of Hand Packer in 2004.

3. On or about February, 2004, I went to L&T to apply for an advertised job vacancy for hand packers. After filling-up and turning in the application form, I was told that L&T will call me for further information.

4. After about two weeks, an L&T personnel who identified herself as Baby Lopez, called me up for interview. When I reported to L&T, a certain Cory Quing and Amy Tse conducted the interview.

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

ORIGINAL

# I.
# MEDICAL FEES
(Physical Examination Fee
and Health Certificate Fee)

5.  After I passed the interview, Baby Lopez asked me to complete the Consensual Transfer documents and have my employer complete and sign them, which I did. I gave the completed consensual transfer documents to Baby Lopez at the HR office. Baby Lopez then asked for and I gave her my health certificate which she noted had not yet expired. She told me that L&T would use my health certificate from my then employer.

# II.
# CONTRACT SIGNING

6.  My first non-resident contract was in 1993. Basically, annually since then, each year, my employers used and had me sign a standard form labor contract provided by DOL. I became familiar with the basic terms of the DOL standard form contract. A copy of such standard form contract is attached as Exhibit "2" to Plaintiffs' Verified/Amended Opposition.

7.  In 2004, when L&T HR staff Baby Lopez handed me their contract form, with only the signature page showing, and insisting that I sign, I had no reason to believe it was not the standard DOL form contract. Prior to signing this L&T contract form and at the time it was presented to me in the HR for signing, I was not given an opportunity to read the contract before signing it. When it was presented to me in the HR office, Baby Lopez just pushed the document through the counter-window with the pages turned back, showing only the signature page, and pointed to where I was to sign it, and said sign, which I did without reading

JOE HILL
Hill Law Offices
P.O. Box 500917 ~ Saipan CM-MP 96950 ~
TEL. NO. (670) 234-6860/7743 ~ FAX: 234-7753

it. There were many other applicants present and waiting in line. The HR staff was rushing me and other applicants by insisting that I and the other applicants I saw present, hurry up and quickly sign, without delaying the document processing. From the mood and way the HR staff was acting, I was made fearful that if I didn't just sign the signature page as instructed, I would lose the job opportunity especially since none of the other applicants I saw there held up the line by or took time to read the contract document. I observed the HR staff acting the same way with other workers who signed before and after my turn. Neither Baby Lopez, nor any one else, ever showed me my contract document until the time and date they asked me (us) to sign at HR. I was never given a copy of the L&T contract document I signed before my termination on or about May 13, 2004. After my termination, I was surprised when I later learned of some of the terms and conditions in L&T's self-styled contract. Had I known that the L&T contract contained terms restricting me from being employed with other competing companies in Saipan and allowing L&T to terminate me at any time as a reduction in force, I would not have agreed to it or signed it.

### III.
### PERFORMANCE EVALUATION

8. There was no individualized measurement or testing to determine my or each Packer's individual performance or production. The only production measurement or test was done by counting the output (production) from each of the different lines of Packers. There was really no way for me as an individual packer to control or show an increase in the number of products because I was just one individual on the line with many others. In the packing section our work

3

was performed by groups of workers on so-called lines. The packages or items we were assigned to work on often varied from day to day. Our Head Supervisor in the packing section was Li, Zhi Min, who is a Chinese. When I and other Filipino workers tried to ask her questions regarding our work she could not answer nor explain because she does not speak english fluently. *(See* Defendant's Response to Plaintiffs' First Set of Request for Interrogatories No. 49a).

## IV.
## TERMINATION

9. I was employed and worked for L&T International Corporation as a hand packer. On the day of termination, May 13, 2004, I was on sick leave because of eye infection.

10. When I reported for work on the succeeding day, I was hoping that I would not be one of those terminated. But as it turned out, I was not spared. Though I was not around on the day of termination, I could feel the same pain and suffering as the rest of the terminated workers.

## V.
## EMOTIONAL DISTRESS

11. When I was hired by L&T, I was so happy because L&T is supposed to be a big and stable company. I thought L&T could give me a better job with better benefits.

12. I became very emotionally upset and disturbed as a result of the termination of my employment at L&T.

13. I was in deep sorrow, suffered headaches, and severe emotional distress

4

caused by the termination. I took tylenol for my headaches.

14. I often had sleepless nights, especially when I thought of our financial liabilities with other persons and entities.

15. On the day of termination, May 13, 2004, was my husband's birthday, while May 18, 2004 was my birthday. We had planned a joint birthday celebration as our annual family affair. It should have been a happy day for the family because we would be celebrating birthdays of members of the family. But instead of celebrating, my family had then a sorrowful moment because of my termination from L&T.

16. The termination left me physically and emotionally drained from the severe emotional distress caused thereby.

17  I noticed and felt that I am not the same person before and after the loss of my job at L&T.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this 29th day of September, 2006.

/s/ Andrea Concepcion
Andrea Concepcion
Declarant

5