IN THE UNITED STATES DISTRICT COURT

FOR THE

NORTHERN MARIANA ISLANDS

| | |
|---|---|
| ABELLANOSA, JOANNA, et al., | Civil Action No. 05-0010 |
| Plaintiffs, | DECLARATION IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| L&T INTERNATIONAL CORP., | |
| Defendant. | |

I, Marichu Navida, hereby declare as follows:

1. I am over the age of eighteen years old, have personal knowledge of the facts set forth herein, am competent to testify as to these facts if called as a witness in a court of law, and if called would testify as stated herein.

2. On or about January, 2004, I went to L&T to apply for an advertised job vacancy for hand packers.

3. I was assisted by Cory Quing and Baby Lopez. I signed an application form and they told me to complete all the required documents like police clearance and health clearance. After several days, I was called for an interview.

4. Cory Quing and Amy Tse interviewed me. They told me to complete all the requirements for employment.

I.

MEDICAL FEES

(Physical Examination Fee

and Health Certificate Fee)

5. Baby Lopez told me that I would need to get a new medical examination and health certificate before my employment application/documentation could be completed and processed.

6. Baby told me to go to Marianas Medical Center to get the examination. I asked her how the medical examination and health certificate are going to be paid for. Baby said you pay for it

now and on your renewal L&T will pay. I understood this to mean that if I did my job and not violate any company rules, that I would be renewed for a second year and that during that second year L&T would pay/repay for the health examination and health certificate fees.

7. I was not paid nor reimbursed by L&T for my services and time spent getting the medical examination and health certificate.

II.

CONTRACT SIGNING

8. Prior to my employment at L&T, I had seen and signed employment contract before. Basically, annually since then, each year, my employers used and had me sign a standard form labor contract provided by DOL. I became familiar with the basic terms of the DOL standard form contract. A copy of such standard form contract is attached as Exhibit "2" to Plaintiffs' Amended Opposition.

9. In 2004, when L&T HR staff Baby Lopez handed me their contract form, with only the signature page showing, and insisting that I sign, I had no reason to believe it was not the standard DOL form contract. Prior to signing this L&T contract form and at the time it was presented to me in the HR for signing, I was not given an opportunity to read the contract before signing it. When it was presented to me in the HR office, Baby Lopez just pushed the document through the counter-window with the pages turned back, showing only the signature page, and pointed to where I was to sign it, and said sign, which I did without reading it. The HR staff was rushing me and other applicants by insisting that I and the other applicants I saw present, hurry up and quickly sign, without delaying the document processing. From the mood and way the HR staff was acting, I was made fearful that if I didn't just sign the signature page as instructed, I would lose the job opportunity especially since none of the other applicants I saw there held up the line by or took time to read the contract document. I observed the HR staff acting the same way with other workers who signed before and after my turn. Neither Baby Lopez, nor any one else, ever showed me my contract document until the time and date they asked me (us) to sign at HR. I was never given a copy of the L&T contract document I signed before my termination on or about May 13, 2004. After my termination I was surprised when I later learned of the terms and conditions in L&T's self-styled contract. Had I known that the L&T contract contained terms restricting me from being employed with other competing companies in Saipan and allowing L&T to terminate me at any time as a reduction in force, I would not have agreed to it or signed it.

III.

PERFORMANCE EVALUATION

10. There was no individualized measurement or testing to determine my or each Packer's individual performance or production. The only production measurement or test was done by counting the output (production) from each of the different lines of Packers. There was really no

way for me as an individual packer to control or show an increase in the number of products because I was just one individual on the line with many others. In the packing section our work was performed by groups of workers on so-called lines. The packages or items we were assigned to work on often varied from day to day. Our Head Supervisor in the packing section was Cao, Li Qun, who is a Chinese. When I and other Filipino workers tried to ask her questions regarding our work she could not answer nor explain because she does not speak english fluently. (*See* Defendant's Response to Plaintiffs' First Set of Request for Interrogatories No. 49a).

IV.

TERMINATION

11. I was employed and worked for L&T International Corporation as a hand packer, from on or about February 2004 to May 13, 2004, when I and other workers in the hand packing section were summoned by the calling of our individual names over the public address system, to report to the Human Resources (HR) office. I believed that we were called in two batches, one about 3:00 p.m., and one about 5:00 p.m. (*See* Deposition of Jack Torres, page 97, lines 14-17).

12. I did not know why we were being called to come to HR. I thought that we were being called regarding anticipated ATM Cards that L&T had previously given us and had some of us filled out an application for, as they told me and other workers present, to make it easier and more convenient for (us) workers to access and get our anticipated bi-weekly wage payments without having to stand in line waiting for and trying to cash payroll checks. I was made more assured of my continued employment and anticipated pay check by L&T having asked me and other workers to set up these ATM accounts to facilitate our anticipated payroll check payments.

13. As we arrived at the designated meeting room, I observed other workers, and Corazon Quing, Malou Ernest and Rhodora Bernabe, known to us as HR staff, were present at the May 13, 2004 meeting.

14. I did not see or hear Corazon Quing read or reading from any document or the so-called "communication plan" as described and stated in Exhibit "A" attached to the Declaration of Corazon Quing.

15. More specifically, I (we) were not told as stated by Corazon Quing that we the workers, had the right to appeal our termination to the "Legal Department" of L&T or to any one else.

16. Neither Malou Ernest, Corazon Quing nor any one else at the May 13, 2004 meeting, informed us, that the purpose of the so-called second check was "to cover for 10 days pay in lieu of notice," as stated in paragraph 7, Declaration of Corazon Quing. Additionally, L&T's own RIF policy required, as proposed RIF workers, that I (we) be given "written notice of separation at least 15 days prior to the effective date of separation, or severance pay in lieu of notice." (*See* Ex. "D" Deposition of Torres, and page 88 lines 6-8 and lines 20-24).

17. It was my honest belief that I and my co-workers were terminated on May 13, 2004 and that the termination was effective immediately on and from May 13, 2004, because I (we) were told by HR staff at the May 13, 2004 meeting that today (May 13, 2004) was our last day of employment and they demanded that we give up and turn in our company ID cards which were required and needed for company employees to freely enter company premises; and more importantly, our I.D.s were swipe-cards for the time-clocks so we could not clock in or out without them, in addition to being required to "turn over any and all company properties in your possession... on or before May 13, 2004" as stated in the Notice of Termination. (*See* Ex. "D," Defendant's Memorandum).

18. As a result I believed and felt that I was terminated and forced to stop working on May 13, 2004, the same date that the Notice of Termination (dated May 12, 2004) was given to me. Hence, I was not given the required prior notice of termination and/or of the RIF.

19. I and the other plaintiffs worked a set work schedule and shift, and worked Monday through Saturday, seven (7) hours a day, six (6) days a week, for a total of forty-two (42) hours each work week, which included two (2) hour overtime each work week while employed at L&T.

V.

EMOTIONAL DISTRESS

20. The way L&T broke the news of termination to us, not individually or privately, but *en masse* in front of all the other employees, resulted in wailing, crying and shouting and pandemonium among the workers present. I and the other workers present were crying and hugging each other and trying to console one another. I was shocked, and dumbfounded.

21. The termination was so sudden and I was so confused as to why we were being terminated. I did my best to do the job and I did not violate any company policy.

22. Because of my termination at L&T, I developed fear of applying for another job thinking that what happened to me at L&T might happen again. I felt that I could not afford to have another bitter experience like what happened to me at L&T. I also realized that prospective employers shied away from employing "terminated" employees. The word termination itself casts bad connotation on applicant's credentials. I felt like other people were laughing at me because of the termination, I felt useless, I lost my self-confidence and self-esteem.

23. After my termination by L&T, I experienced severe headaches. I had so many sleepless nights thinking about why our termination happened. I always cried especially when I think about the education of my kid. I felt stomach aches and became nauseous most of the time.

24. When my mother learned about what happened to me at L&T, she had a mild stroke. Because my mother's condition worsened and my family needed my presence, I decided to go back home to the Philippines.

25. In the Philippines, I went to the Philippine General Hospital (PGH) for a free check up. The examinations showed that there is a myoma in my uterus and I needed to undergo some more tests and take medication. Because I lost my job at L&T, I could not afford to buy some of the medicines needed for my continued medication.

26. The termination left me physically and emotionally drained from the severe emotional distress caused thereby. I noticed and felt that I am not the same person before and after the loss of my job at L&T.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed this 28th day of September, 2006.

/S/ *Marichu Navida*

Marichu Navida

Declarant